**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LEFTA ASSOCIATES, ULYSSES G. AUGER TRUST, AND LULU H. AUGER TRUST,** | : : : : | **Civil No. 1:09-CV-2487** |
| **Plaintiffs,** | : : | **(Judge Jones)** |
| | : | **(Magistrate Judge Carlson)** |
| **v.** | : : | |
| **JACK F. HURLEY, JR., RHOADS & SINON, LLP, AND PAXTON LAND COMPANY,** | : : : : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

### I.   INTRODUCTION

Now pending in this action are two motions that relate to documents that Plaintiffs produced to Defendants during the course of discovery.  Plaintiffs claim that the documents in question were produced inadvertently, are subject to the attorney-client privilege, and are, therefore, confidential.  Plaintiffs further contend that, pursuant to a confidentiality agreement entered into in this case, Defendants were obligated either to return the documents or to destroy them, and to make no unauthorized use of the materials.  Because Plaintiffs believe Defendants failed to adhere to the terms of the confidentiality agreement with respect to at least some of the documents that were produced, Plaintiffs have moved for enforcement of the

confidentiality agreement, and the imposition of sanctions against Defendants and their attorneys.  (Doc. 62.)

In response, and in marked contrast, Defendants have filed a motion seeking a judicial determination that the documents that Plaintiffs produced were not privileged or confidential, and, therefore, that Defendants could not have been in violation of the confidentiality agreement or subject to sanctions.  (Doc. 71.) Furthermore, Defendants argue that even if the documents in question were privileged or otherwise confidential, Defendants and their counsel have not violated the terms of the confidentiality agreement in this case because the documents were never used for any prohibited purpose.  Defendants also argue that there is no factual or legal basis for the imposition of sanctions as a result of Defendants' conduct.

The motions are fully briefed, and have been supported by a number of affidavits and declarations from counsel in this case.  Upon careful consideration of the documents in question, the briefs filed in support of and opposition to the parties' competing motions, and the evidentiary materials offered by the parties, we conclude that the documents at issue are not protected by the attorney-client privilege, and Defendants were not, and are not, obligated to return the documents or to refrain from

using them in this litigation.[1]  Moreover, assuming that Defendants were obligated

to adhere to the terms of the confidentiality agreement in place in this litigation, we

find insufficient evidence to show that Defendants violated the terms of this

agreement by misusing the produced material.  Instead, the evidence submitted

suggests that Defendants adhered to the terms and conditions of the confidentiality

agreement in handling the documents produced, and in seeking a judicial declaration

that the materials were not protected, whereas Plaintiffs rely on nothing more than

speculation that Defendants must have used the materials improperly and used them

as a basis for filing additional affirmative defenses to the claims in this case.  We find

this bare speculation to be insufficient to support Plaintiffs' quite serious charges of

attorney misconduct, and conclude that the evidence of record indicates that

Defendants' counsel did not behave improperly.

Moreover, we reject Plaintiffs' argument that Defendants should be prohibited

from arguing that the documents in question are not privileged on the basis that

Defendants were dilatory in responding to Plaintiffs' claims of privilege, when

Plaintiffs did not assert those claims of privilege for four months after the documents

---

[1]  Plaintiffs subsequently withdrew their claim of privilege regarding two sets of documents, and further withdrew their claim that the documents produced constituted attorney work product.  Accordingly, in this memorandum we consider only the three categories of documents that Plaintiffs contend are protected by the attorney-client privilege.

in question were produced.  Not only do Plaintiffs provide no persuasive authority that such a sanction would be warranted, but we conclude that the sanction is particularly inappropriate in this case, where Plaintiffs seek the enforcement of a confidentiality agreement that itself provided that the privilege was to be maintained as to inadvertently produced documents only when the producing party "promptly requests [their] return . . . ."  (Doc. 20.)  As Plaintiffs waited for four months before claiming that the documents in question were produced inadvertently, it would appear equally if not more reasonable to conclude that it was Plaintiffs who had failed to comply with the terms of the Confidentiality Order by asserting a claim of privilege and inadvertent production four months after making the documents available to Defendants.  In any event, for these reasons and as more fully explained below, upon consideration of the parties' substantive arguments and evidentiary showings, Plaintiffs' motion will be denied and Defendants' motion will be granted.

## II.    **BACKGROUND**

Plaintiffs are the owners of certain partnerships with interests in the Gateway Gettysburg development, one or more real estate projects in Adams County, Pennsylvania.  Plaintiffs initiated this lawsuit against the Harrisburg law firm Rhoads & Sinon, one of its partners, and the law firm's title company, for legal malpractice and related claims arising out of the Gateway Gettysburg project.  In the complaint,

Plaintiffs allege that Defendants mishandled certain loan documents, and otherwise performed negligently, and that as a result of Defendants' negligence, certain guaranty documents that were executed in connection with the Gateway Gettysburg project imposed a 50% guaranty obligation on the Plaintiffs, as opposed to a 25% obligation that Plaintiffs had agreed to.   Defendants vigorously dispute Plaintiffs' allegations.

Discovery in the case began in March 2010.   Due to the large volume of documents that the parties were exchanging, and in order to control discovery-related costs in this case, the parties entered into a stipulated order regarding confidential material (the "Confidentiality Order"), which the Court entered on June 8, 2010. (Doc. 20.)   The Confidentiality Order authorized the parties to identify documents produced as "confidential," which would provide that the documents could only be used in connection with this litigation, and could not be disclosed to anyone other than parties, counsel, and consultants.   (Id., ¶ 1(e).)   In addition to authorizing the parties to designate discovery as confidential, the Confidentiality Order also served as

> a mechanism to avoid waiver of privilege or any other applicable protective evidentiary doctrine as a result of the inadvertent disclosure of documents containing privileged communications.

(Id., at 1.)  In this regard, the Confidentiality Order provides three rules that govern the inadvertent production of privileged documents.

First, the Confidentiality Order provides that the inadvertent production of privileged documents "shall NOT waive any privilege . . . if the producing party. . . promptly requests its return" after taking reasonable care to avoid the inadvertent production.  (Id., ¶ 1(a).)

Second, the Confidentiality Order provides that if the producing party gives notice that it produced privileged documents by mistake, the other side is either to return the documents immediately or destroy them, and certify compliance within 30 days.  (Id., ¶ 1(b).)

Third, if the requesting party disputes the privilege claim, "a single set" of the documents "may be sequestered and retained by and under the control of the requesting party for the sole purpose of seeking court determination of the [privilege] issue."  (Id., ¶ 1(c).)

The Confidentiality Agreement is thus structured to achieve two goals: First, it allows the parties to prevent the requesting party from improperly using or benefitting from the unintentional disclosure of privileged documents during the course of a discovery process involving the exchange of a substantial amount of documents by both sides in this action. In addition, it permits parties receiving

6

documents that are later claimed to be cloaked in privilege to challenge that assertion of privilege in court.

On September 30, 2010, several months after producing documents in the case, Plaintiffs notified Defendants that they had inadvertently produced a number of documents that they claimed were subject to the attorney-client privilege, or which otherwise constituted attorney work product. (Doc. 80, Ex. A, Letter Dated September 30, 2010.) Defendants responded to this letter several months later, on January 3, 2011, conceding that certain of the documents were privileged and indicating that the documents would be destroyed, but disputing Plaintiffs' remaining claims of privilege. (Doc. 80, Ex. B, Letter Dated January 3, 2011 (misdated 2010).) Plaintiffs, in turn, replied on January 10, 2011, further agreeing that some documents were, in fact, not privileged, but maintaining their claims of privilege with respect to the remaining documents. (Doc. 80, Ex. C, Letter Dated January 10, 2011.) Defendants wrote to Plaintiffs on February 3, 2011, agreeing that one additional disputed document was privileged and would be destroyed, but indicating that the remaining documents remained in dispute, and that Defendants would seek court intervention to resolve the impasse. (Doc. 80, Ex. D, Letter Dated February 3, 2011.)

On February 7, 2011, Plaintiffs filed a motion to compel compliance with the Confidentiality Order, and requested that the Court impose sanctions as a result of

what Plaintiffs contended were Defendants' violations of the Confidentiality Order

with respect to the disputed documents.  (Doc. 62.)  Plaintiffs filed a brief in support

of the motion on the same day, with a number of exhibits and supporting materials

(Doc. 63), and Defendants responded with a brief in opposition and their own

supporting materials on March 2, 2011 (Doc. 70).  Plaintiffs filed a reply brief on

March 16, 2011 (Doc. 79), and Defendants, after obtaining leave of court (Doc. 97),

filed a sur-reply on April 7, 2011 (Doc. 98), to provide further support for their

assertion that their counsel had made no improper use of the disputed discovery

documents.

On March 2, 2011, after Plaintiffs' filed their motion seeking enforcement of

the Confidentiality Order, Defendants took a different tack, moving for entry of an

order declaring that the documents Plaintiffs' inadvertently produced were not

privileged.  (Doc. 71.)  Defendants filed a brief in support of this motion on March

16, 2011, and attached a number of exhibits and supporting materials.[2]  (Doc. 80.)

Plaintiffs filed a brief in opposition to this motion on April 7, 2011 (Doc. 96), to

---

[2] The parties filed a motion seeking leave of court to file Exhibits D, E, F, G, and I to Defendants' brief in opposition to Plaintiffs' motion under seal because the documents were marked "confidential" and, therefore, were to be governed by the terms of the Confidentiality Order entered in this case.  (Doc. 74.)  On March 11, 2011, the Court granted the motion and permitted Defendants to file these exhibits under seal with the Court for resolution of the competing motions.  (Doc. 78.)

which Defendants replied on April 28, 2011 (Doc. 101).  The District Court then referred both motions to the undersigned for resolution.  (Docs. 64, 72.)

The documents that remain in dispute fall into three general categories, which have been compiled as Exhibits E, F, and G to Defendants' brief in opposition to Plaintiff's motion.  (Doc. 70, Ex. E, F, and G.)  The first category of documents consists of spread-sheet financial forecasts that relate to the Gateway Gettysburg project, and emails from Ulysses Auger, Jr., in which he forwards these forecasts to himself.  (Doc. 70, Ex. E.)  Plaintiffs claim that these documents are privileged because they were "prepared by Ulysses Auger, sometimes with the assistance of Lefta Associates' attorney Bruce Goldstein or its consultant Bill Johnson, for discussion purposes among Lefta Associates and its counsel." (Doc. 80, Ex. C, Letter Dated January 10, 2011.)  In keeping with the definitions used by the parties, the Court will refer to this category of documents as "The Financial Forecasts."

The second category of documents include Ulysses Auger's notes regarding "talking points" that were to be used or addressed during negotiations with lenders who were financing the Gateway Gettysburg project loans.  (Doc. 70, Ex. F.)  The Court will refer to this category of documents as "The Talking Points Notes."  With one exception, this category of documents does not clearly appear to contain or indicate any communication between Plaintiffs and their attorneys.  Nevertheless,

9

Plaintiffs marked these documents as confidential attorney-client communications, and insist that they were prepared with counsel for use in negotiations with the banks financing the projects.

The final category of documents appear to consist principally of power-point presentations that contemplate restructuring scenarios that Plaintiffs were evaluating in connection with the Gateway Gettysburg project and its financing. (Doc. 70, Ex. G.) The Court will refer to this category of documents as "The Restructuring Scenarios." In addition to the power-point presentations, these documents also include certain emails transmitting the presentations from Auger to himself, and also to Pat Steckler, who is an employee of Plaintiffs. (Id.) On their face, none of the documents indicate that they include communications between Plaintiffs and their lawyers for the purpose of receiving legal advice. Plaintiffs insist that these documents are privileged either because they "were prepared by Ulysses Auger and sent to Left Associates' attorneys Bruce Goldstein and Larry Roscher for use in discussions among Lefta Associates and its attorneys," (Doc. 80, Ex. C, Letter Dated January 10, 2011), or because they were prepared by Mr. Auger and his counsel. (Doc. 96, Attach. Declaration of Bruce Goldstein, Esq., ¶ 13.)

In the competing motions that are now before the Court, Plaintiffs place great emphasis on the ***process*** that the parties agreed was to govern the inadvertent

production of privileged or confidential documents, whereas Defendants focus instead on the ***substance*** of the documents actually produced in this case, and whether these documents are privileged.  Upon review of the voluminous documents that are at issue in this dispute, we conclude that Plaintiffs have not demonstrated that the documents are covered by the attorney-client privilege, and thus find it unnecessary to consider further whether the parties faithfully complied with the terms and conditions set forth in the Confidentiality Order.  For the reasons explained below, we find that Plaintiffs have not demonstrated that the documents are subject to the attorney-client privilege, and, therefore, they are not subject to the clawback provisions of the Confidentiality Agreement.  Having so found, we find it unnecessary to resolve Plaintiffs' ancillary arguments that Defendants violated one or more terms of the Confidentiality Order itself, and we thus decline Plaintiffs' invitation to consider the imposition of sanctions for Defendants' conduct during discovery.[3]

---

[3]  With that having been said, it bears mention that upon consideration of the parties' competing submissions, we do not agree with Plaintiffs that Defendants must be presumed to have made illicit use of the documents that were being challenged pursuant to the terms of the Confidentiality Order.  Defendants have submitted sworn declarations from their lawyers who have attested that counsel did not make any prohibited or improper use of the materials produced pending a resolution of Plaintiffs' and Defendants' related motions.  Against these sworn declarations made by officers of the court, Plaintiffs have offered only conjecture and speculation in support of their serious allegations that counsel engaged in

## III.   <u>DISCUSSION</u>

### A.   **The Attorney-Client Privilege Under Pennsylvania Law.**

Rule 501 of the Federal Rules of Evidence provides, in relevant part, as follows:

> [I]n civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

Fed. R. Civ. P. 501.  Thus, in diversity actions, such as the instant litigation, the law governing evidentiary privileges is supplied by the courts of the state in which the federal court sits.  See, e.g., Rhone-Poulenc Rorer v. Home Indem. Co., 32 F.3d 851, 861 (3d Cir. 1994); Maertin v. Armstrong World Indus., Inc., 172 F.R.D. 143, 147 (D.N.J. 1997); McDowell Oil Serv., Inc. v. Interstate Fire & Cas. Co., 817 F. Supp. 538, 545 (M.D. Pa. 1993) (in diversity action, party's assertion of attorney-client privilege governed by state law).  In accordance with these settled principles, Plaintiffs' assertion that the disputed documents constitute attorney-client-privileged communications is governed by Pennsylvania law.

---

inappropriate conduct.  We find that the balance of evidence tilts decidedly in Defendants' favor on this point.  However, it is not necessary for the Court to consider further or resolve the parties' arguments on this subject, because the documents that remain in dispute are not privileged, and therefore Plaintiffs' claims that the Confidentiality Agreement was violated is moot.

The Pennsylvania Supreme Court has recently had occasion to explain the scope of the attorney-client privilege in Pennsylvania, and specifically to "consider whether, and to what degree, the attorney-client privilege attaches to attorney-to-client communications." Gillard v. AIG Ins. Co., 15 A.3d 44, 46 (Pa. 2011). In Gillard, the Pennsylvania Supreme Court was addressing the scope of the attorney-client privilege, and observed that "Pennsylvania courts have been inconsistent in expressing the scope of the attorney-client privilege." Id. at 56. In making this observation, the court offered one possible interpretation for the inconsistent judicial treatment of the privilege in Pennsylvania:

> Presumably, the disharmony relates to the ongoing tension between the two strong, competing interests-of-justice factors in play – namely – the encouragement of trust and candid communication between lawyers and their clients, and the accessibility of material evidence to further the truth-determining process. In light of this conflict, very good arguments are made on both sides concerning the privilege's appropriate breadth.

Id. at 57. In Gillard, the court was addressing – and resolving – a particular dispute that had arisen under Pennsylvania law with respect to whether, and to what extent, the attorney-client privilege attached at all to communications made from a lawyer to his client. Id. at 46. Although the fact that this was something of an open question under Pennsylvania law is somewhat surprising, the confusion regarding the scope

13

of the privilege appears to have resulted from the fact that, by statute, Pennsylvania provides only for the confidentiality of communications made by a client to a lawyer. See 42 Pa. Cons. Stat. Ann. § 5928. Because of this limited statutory scope, some Pennsylvania courts had construed the scope of the privilege especially narrowly, and concluded that the privilege operated as a "one-way street," id. at 48, by protecting only communication from a client to a lawyer.

In Gillard, the Pennsylvania Supreme Court rejected this narrow interpretation of the privilege's application in Pennsylvania and made clear that the privilege "does afford derivative protection," id. at 57, and thus applied to confidential communication from a lawyer to a client. Accordingly, the Pennsylvania Supreme Court held that "in Pennsylvania, the attorney-client privilege operates in a two-way fashion to protect confidential client-to-attorney or attorney-to-client communications made for the purpose of obtaining or providing professional legal advice. Id. at 59. Accordingly, following Gillard, in order for the attorney-client privilege to attach, the party asserting the privilege must demonstrate that: (1) the information for which protection is sought was a communication from a client to an attorney, or from an attorney to the client; (2) the communication was kept confidential; and (3) the communication was made for the purpose of obtaining or providing legal advice. See

Gillard, supra.[4]

Significantly, not every communication involving a lawyer meets this test, and the communication must have been made for the express purpose of obtaining or providing legal advice, as "[o]rdinary business advice is not protected." See Wise Investments, Inc. v. Bracy Contracting, Inc., No. 01-3458, 2002 U.S. Dist. LEXIS 22263, *3 (E.D. Pa. Oct. 23, 2002); see also Wachtel v. Health Net, Inc., 482 F.3d 225, 231 (3d Cir. 2007) ("Where a lawyer provides non-legal business advice, the communication is not privileged."); Teltron v. Alexander, 132 F.R.D. 394, 396 (E.D. Pa. 1990) ("[T]he privilege is limited to confidential communications with an attorney

---

[4] The Third Circuit has articulated the requirements applicable to the attorney-client privilege as follows:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his or her subordinate, and (b) in connection with the communication is acting as a lawyer; (3) the communication relates to a fact which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily (I) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding, and (d) not for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

Rhone-Poulenc Rorer, Inc., v. Home Indem. Co., 32 F.3d at 862 (citing United States Shoe Mach. Corp., 89 F. Supp. 357, 358-59 (D. Mass. 1950)).

acting in his professional legal capacity  for the express purpose of obtaining legal advice."); see generally Upjohn Co. v. United States, 449 U.S. 383,  395-96 (1981) (privilege does not extend to business advice or to protect clients from factual investigations).

It is widely recognized that the attorney-client privilege serves a salutary purpose: "[T]o encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."  Id. at 389; see also In re Search Warrant B-21778, 521 A.2d 422, 428 (Pa. 1987) ("Its necessity obtains in the objective of promoting the most open disclosure in order to enhance the attorney's effectiveness in protecting and advancing his client's interests."); Restatement (Third) of the Law Governing Lawyers § 68 cmt. c (2000) (observing that the privilege "enhances the value of client-lawyer communications and hence the efficacy of legal services").

At the same time, "because the privilege obstructs the search for the truth and because its benefits are, at best, 'indirect and speculative,' it must be 'strictly confined within the narrowest possible limits consistent with the logic of its [purpose].'" In re Grand Jury Investigation, 599, F.2d  1224, 1235 (3d Cir. 1979) (citation omitted) (quoting 8 Wigmore on Evidence § 2291, at 545 (McNaughton rev. 1961); see also United States v. Nixon, 418 U.S. 683, 709-10 1974) (privileges

16

against compelled disclosure, although intended to protect legitimate interests, interfere with the search for truth and must not be construed expansively). Yet, courts need to be careful that they do not construe the privilege so narrowly that they frustrate its purposes. See Upjohn, 449 U.S. at 390-96; see also Delco Wire & Cable, Inc. v. Weinberger, 109 F.R.D. 680, 687 (E.D. Pa. 1986) ("Thus, the principles by which [the court] must be guided are countervailing: the privilege may neither be given undue breadth nor be unduly restricted.").

With these substantive requirements and policy considerations in mind, the party asserting the privilege bears the burden of proving that the privilege applies to a particular communication. See Joe v. Prison Health Servs., 782 A.2d 24, 31 (Pa. Commw. Ct. 2001); see also In re Grand Jury, 603 F.2d 469, 474 (3d Cir. 1979); SEPTA v. CaremarkPCS Health, L.P., 254 F.R.D. 253, 259 (E.D. Pa. 2008) ("The party asserting the attorney-client privilege 'bears the burden of proving that it applies to the communication at issue.'") (quoting Sampson v. Sch. Dist. of Lancaster, 2008 U.S. Dist. LEXIS 91421, 2008 WL 4822023, at *3 (E.D. Pa. Nov. 5, 2008)). In this regard, "[t]he burden of establishing the elements of the privilege can be met only by an evidentiary showing based on competent evidence and cannot be discharged by mere conclusory or *ipse dixit* assertions." Greene, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, L.L.C., 2002 F.R.D. 418, 423 (E.D. Pa.

17

2001). "Rarely, if ever, will the submission of documents to the court for *in camera* inspection be adequate to prove the existence of the elements necessary to establish the applicability of the privilege." Delco Wire & Cable, Inc. v. Weinberger, 109 F.R.D. 680, 688 (E.D. Pa. 1986). Instead, "a party claiming the privilege must present record evidence, such as affidavits, and sufficient facts to bring the communication at issue within the narrow scope of the privilege." Wise Investments, No. 01-3458, 2002 U.S. Dist. LEXIS 22263, at *5 (citing Delco Wire & Cable, Inc., 109 F.R.D. at 688).

Notably, for purposes of the instant discovery dispute, the "attorney-client 'privilege does not shield documents merely because they were transferred to or routed through an attorney.'" Smithkline, 232 F.R.D. at 478 (quoting Resolution Trust Corp. v. Diamond, 773 F. Supp. 597, 600 (S.D.N.Y. 1991)). Thus, "[w]hat would otherwise be routine, non-privileged communications between corporate officers or employees transacting the general business of the company do not attain privileged status solely because in-house or outside counsel is 'copied in' on correspondence or memoranda." Smithkline, 232 F.R.D. at 478 (quoting Andritz Sprout-Bauer v. Beazer East, 174 F.R.D. 609, 633 (M.D. Pa. 1997)). Accordingly, in order to invoke properly the attorney-client privilege, the party seeking to prevent disclosure "must clearly demonstrate that the communication in question was made

for the express purpose of securing legal not business advice." AAMCO Transmissions, Inc. v. Marino, Nos. 88-5522, 88-6197, 1991 U.S. Dist. LEXIS 13326, *9 (E.D. Pa. Sept. 24, 1991).

### B.     Application of the Privilege in this Case.

With the foregoing principles in mind, we turn to the three categories of documents that Plaintiffs claim are protected by the attorney-client privilege in this case.  We consider each of these categories of documents seriatim.

### 1.     The Financial Forecasts.

The Financial Forecasts primarily consist of spread-sheet financial forecasts that relate to the Gateway Gettysburg project, and emails from Ulysses Auger, in which he forwards these forecasts to himself.  (Doc. 70, Ex. E.)  Plaintiffs claim that these documents are privileged because they were "prepared by Ulysses Auger, sometimes with the assistance of Lefta Associates' attorney Bruce Goldstein or its consultant Bill Johnson, for discussion purposes among Lefta Associates and its counsel."  (Doc. 80, Ex. C, Letter Dated January 10, 2011.)  However, upon review of these documents, we find essentially no indication that the documents represent confidential attorney-client communications, and other than the affidavit that Defendants' attorney, Bruce Goldstein, submitted in which he provided an overview

of the legal services he provided to Ulysses Auger, we find that Defendants have provided nothing that would allow the Court to conclude that these materials constitute privileged, confidential communications between lawyer and client. Indeed, even Mr. Goldstein's affidavit fails to demonstrate that these documents themselves represent confidential communications:

> Among the materials Mr. Auger and I reviewed at these meetings were forecasts and projections which he had prepared to use as an analysis of the Gateway Gettysburg Properties in connection with our discussions of strategy and the development of restructuring proposals and proposals to Monahan.   As we reviewed each loan, forecast, and projection, Mr. Auger and I had candid discussions during which I provided my legal opinions concerning (a) the loan documents, (b) the legal posture of Lefta and the Trusts with regard to the loans, and (c) possible negotiating strategies for negotiating with Susquehanna Bank, other banks, and/or Mr. Monahan. Mr. Auger gave me his ideas about potential negotiating positions and their possible impact on the loans, forecasts, and projections.   The forecasts and projections were important tools in our strategy discussions because they enabled us to combine the legal and business factors which are crucial in loan restructurings.

(Doc. 96, Attach., Declaration of Bruce Goldstein, Esq., at ¶ 9) (hereafter "Goldstein Decl. ¶ __.") Mr. Goldstein also attests, in general fashion, that the "forecasts and projections, [were] revised from time to time, which resulted from those meetings directly reflected both the legal opinions about the loans I furnished to Mr. Auger,

and the confidential forecasts and projections he gave me." (Id., ¶ 10.)  For these reasons, Mr. Goldstein explains that Mr. Auger marked the documents as privileged because he believed they constituted attorney-client privileged material.

Following a review of these materials, which in large part appear to be spreadsheets with differing financial projections contained within them, we cannot find that these documents constitute communications, much less privileged communications that were exchanged for the purpose of obtaining or furnishing legal advice.  Although Mr. Goldstein offers a general explanation that seems to suggest that it is impossible to untangle business advice from legal counsel owing to the type of financial transactions at issue, (id., ¶ 4), neither Plaintiffs nor Mr. Goldstein provide any description or explanation as to the parties' "candid discussions," "legal opinions," or even the "ideas" that Ulysses Auger exchanged with his lawyer.

Upon consideration, we agree with Defendants that even assuming that the Financial Forecasts may have provided the catalyst for confidential communications between Mr. Goldstein and Mr. Auger, it does not cause the Financial Forecasts themselves to become privileged communications.  We further agree that the documents in question appear as nothing more than Mr. Auger's own financial and factual analyses regarding the real estate projects in Gettysburg.  Because the privilege extends to cover legal communications between a lawyer and client, and not

to facts themselves, we conclude that the Financial Forecasts are not protected from disclosure by the attorney-client privilege, and we find that Plaintiffs' have failed to discharge their burden of showing that the documents should be protected from disclosure.

### 2.    The Talking Points Notes.

The second category of documents include Ulysses Auger's notes regarding "talking points" that were to be used or addressed during negotiations with lenders who were financing the Gateway Gettysburg project loans.  (Doc. 70, Ex. F.)  With one exception, this category of documents does not appear to contain or indicate any communication between Plaintiffs and their attorneys.   Nevertheless, Plaintiffs marked these documents as confidential attorney-client communications, and insist that they were prepared with counsel for use in negotiations with the banks financing the projects.

In his declaration, attorney Bruce Goldstein attests that Mr. Auger "frequently discussed presentations to the banks, and strategized about the best way to achieve restructuring or workout[,]" and that these discussions were reduced to writing in the form of the Talking Points Notes.  (Goldstein Decl. ¶ 11.)  As with the Financial Forecasts, however, neither Mr. Goldstein nor Plaintiffs explain adequately, or persuasively, as to how the Taking Points Notes reflect or demonstrate any protected

22

attorney-client communications.  Plaintiffs represent that "[t]he need for legal advice in connection with the Talking Points documents is apparent."   (Doc. 96, at 5.) Whether or not the need for legal advice in connection with preparing talking points is "apparent," what is not apparent is that the Talking Points Notes themselves represent confidential communications between a lawyer and client.  Instead, they appear to consist of information that was conveyed to a third party, and they do not, in any event, reflect the discussions or communications between Mr. Auger and Mr. Goldstein that may have informed Mr. Auger's presentations or restructuring strategy. We thus agree with Defendants that although those conversations and communications may be privileged, the Talking Points themselves are not protected.

      We do pause to observe that one of the documents included with the Talking Points Notes is an email from Mr. Auger to Mr. Goldstein.  (Doc. 70, Ex. F, LEFTA00015255.)  Although this is a communication between Mr. Auger and Mr. Goldstein, review of the single email in question reveals that it does not contain any confidential information, or legal advice; to the contrary, it merely indicates that Mr. Auger had a phone conversation with a bank representative.  Upon consideration, because this single email reveals no confidential attorney-client communications that we can discern, and because Plaintiffs have failed to carry their burden of showing

that the Talking Points Notes are covered by the attorney-client privilege, we are unable to find that the privilege attaches to these documents.

### 3.   The Restructuring Scenarios.

The final category of documents that Plaintiffs' contend are protected from disclosure by the attorney-client privilege are the Restructuring Scenarios, which Plaintiffs contend are "closely related" to the Financial Forecasts. (Doc. 96, at 5.) These documents consist largely of power-point presentations that reflect restructuring possibilities that Plaintiffs were exploring with respect to the Gateway Gettysburg project. According to Mr. Goldstein, he and Mr. Auger had numerous conversations about these various alternatives, and he attests that the Restructuring Scenarios "summarized the results" of these conversations. (Goldstein Decl. ¶ 13.)[5] In keeping with the generality of Mr. Goldstein's declaration, however, nothing in the declaration explains what aspects of the Restructuring Scenarios reveal confidential

---

[5] As Defendants note, there seems initially to be some inconsistency between Mr. Goldstein's representation that the Restructuring Scenarios are summaries of attorney-client communications, on the one hand, and Plaintiffs' earlier representation to Defendants that the Restructuring Scenarios "were prepared by Ulysses Auger and sent to Lefta Associates' attorneys Bruce Goldstein and Larry Roscher for use in discussions among Lefta Associates and its attorneys." (Doc. 80, Ex. C, Letter Dated January 10, 2011.) However, we understand Plaintiffs explanation to be that some portion of the Restructuring Scenarios was prepared following discussions with counsel, whereas some portion reflected Mr. Auger's own analysis of the proposals. (Doc. 96, at 5.)

attorney-client communications, and the documents themselves are silent on this point.  The absence of information is telling and compels us to decline Plaintiffs' invitation to find that these documents are protected from disclosure by the privilege. Although we can imagine that the conversations or other communications that Mr. Auger and Mr. Goldstein may have shared regarding the potential restructurings would themselves be protected from disclosure, the Restructuring Scenarios simply do not appear to constitute communications, and Plaintiffs have failed to demonstrate that the privilege should attach to these documents.

We also find persuasive Defendants' assertion that these particular documents have considerable evidentiary value to this case because they go some way towards suggesting that Plaintiffs were aware that their guaranty obligations may be 50%, as opposed to 25%, and because they reveal Plaintiffs' motives for restructuring the loans and their assessment of the financial risks and upside in connection with the project.  As we observed above, although the attorney-client privilege serves an especially important purpose in fostering uninhibited and frank communication between a lawyer and client, it also has the risk of interfering with the search for the truth, and for that reason care must be taken to ensure that it is applied carefully and in limited fashion.  In this case, we not only find that Plaintiffs have failed to meet their burden of demonstrating that the Restructuring Scenarios are protected by the

attorney-client privilege, but find further that to cloak them with protection from discovery in this case could very well obfuscate issues that are critically important to a fair resolution of the parties' dispute.

## IV.  **CONCLUSION**

Upon consideration, therefore, we conclude that Plaintiffs have failed to demonstrate adequately that the documents being challenged in this case – the Financial Forecasts, the Talking Points Notes, and the Restructuring Scenarios – constitute privileged attorney-client communications.  For that reason, we find that Plaintiffs' motion for sanctions for Defendants' alleged violation of the Confidentiality Order must be denied, and that Defendants' motion to determine that the disputed documents are not privileged and subject to clawback should be granted.

Having found that the documents in question are not privileged, we further decline Plaintiffs' invitation to consider whether Defendants complied faithfully with all aspects of the Confidentiality Order governing discovery, and the clawback of inadvertently produced documents, in this case.  In addition, upon reviewing the evidence submitted by the parties in support of and opposition to the competing motions for relief, we find that Defendants did not misuse the discovery that was produced, and later challenged.  For this additional reason, we find that there is no basis for the imposition of sanctions against any party.

V.   **ORDER**

Accordingly, for the reasons set forth above, having concluded that the Financial Forecasts, the Talking Points Notes, and the Restructuring Scenarios are not protected from disclosure by the attorney-client privilege, IT IS HEREBY ORDERED THAT:

1.   Plaintiffs' Motion to Compel Compliance with Protective Order, for Sanctions Including Striking Certain of Defendants' Affirmative Defenses, and for Other Relief (Doc. 62) is DENIED.

2.   Defendants' Motion to Determine That Disputed Documents Subject to Plaintiffs' "Clawback" Request are Not Protected is GRANTED. Defendants shall be permitted to retain and use the Financial Forecasts, the Talking Points Notes, and the Restructuring Scenarios in connection with this litigation.

*/s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge