## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LEFTA ASSOCIATES, ULYSSES G. AUGER TRUST, AND LULU H. AUGER TRUST,** | : : : | |
| | : | **Civil No. 1:09-CV-2487** |
| **Plaintiffs** | : | **(Judge Jones)** |
| v. | : : | **(Magistrate Judge Carlson)** |
| **JACK F. HURLEY, JR., RHOADS & SINON, LLP, AND PAXTON LAND COMPANY,** | : : : : | |
| **Defendants** | | |

## REPORT AND RECOMMENDATION

Now pending in the above-captioned action is defendants' motion for summary judgment (Doc. 135.), and plaintiffs' motion for leave of court to permit the substitution of the trustees and partners as the proper parties-plaintiff in this case pursuant to Rule 17 of the Federal Rules of Civil Procedure (Doc. 159.). The motions are fully briefed and have been referred to the undersigned for purposes of preparing a report and recommended disposition. The court heard oral argument on the motions on Monday, August 6, 2012.

## I.   **BACKGROUND**[1]

The above-referenced action arises out of a troubled real estate development project that was undertaken in Gettysburg, Pennsylvania, beginning in 2004.  The project, called the "Gateway Gettysburg," is situated on approximately 100 acres of land in Adams County, Pennsylvania.  The Gateway Gettysburg project involved the construction of two hotels, two restaurants, a multi-screen movie theater, and the production of a movie about the Civil War battles in Gettysburg entitled "Fields of Freedom."  The hotels and restaurants are operational and apparently capable of servicing their debts; in contrast, the theater is struggling financially and facing impending challenges, and the "Fields of Freedom" film has been described by the parties as an abject failure.

The plaintiffs in this action became limited partners in five Pennsylvania limited partnerships that were formed to facilitate the development of Gateway Gettysburg.  The projects were financed by multiple bank loans specific to each aspect of the overall project.  Only two of those loans are implicated in this lawsuit: a $10.8 million dollar loan from Community Banks to fund construction of a 10-screen movie theater ("Theater Loan") and a $3.9 million loan from Community

---

[1]  The factual background set forth in this report is derived from the parties' statements and counterstatements of material fact, to the extent the facts appear to have evidentiary support and are free from genuine dispute.

Banks to fund production of "Fields of Freedom" (the "Production Loan"), both of which closed on December 27, 2005.

With respect to each of these two loans, the plaintiffs were required to provide guarantees to the lender. In the course of their negotiations with the bank and the other partners, the plaintiffs agreed to guaranty the loans, provided that the total guaranty under both loans would be capped at 25% of the outstanding loan obligations. As explained below, however, the closing documents ultimately did not contain this limitation, but instead obligated the plaintiffs to an aggregate 50% guaranty obligation. This undisputed fact forms the central basis for this lawsuit.

Following the discovery that their guaranty obligations were 50% rather than 25%, and after they allegedly began making payments under the guarantees in 2008, plaintiffs brought this action on December 16, 2009, against the following defendants Jack Hurley, Esq., a Harrisburg real estate lawyer who was involved in providing lending counsel for the Gateway Gettysburg project, as well as Hurley's law firm, Rhoads & Sinon, L.L.P., and an entity that Hurley controls called the Paxton Land Company. (Doc. 1.) The plaintiffs also restructured and re-negotiated their indebtedness to the bank.

The gist of plaintiffs' claims is that Hurley was acting as the plaintiffs' lending counsel in Pennsylvania in connection with the both the Theater and Productions

Loans, and in this capacity had agreed and committed himself to obtain either:  (1) signed certifications from the lender that would have expressly limited the plaintiffs' guaranty obligations under the loans to 25% of the outstanding loan balances, consistent with the parties' agreement; or (2) refuse to release the plaintiffs' loan guarantees until these lender certificates were signed.  Plaintiffs claim that Hurley failed to satisfy this obligation, and further allege that he committed legal malpractice by permitting the loan transactions to close without incorporating the bank's signed certifications to expressly limit the guarantees being provided.  Plaintiffs claim that they have suffered substantial damages as a result of Hurley's alleged failures in this regard.  Defendants deny each and every one of the plaintiffs' claims, contend there is no evidence to support plaintiffs' theories for relief, and maintain that plaintiffs have actually never suffered any compensable injury because, according to defendants, plaintiffs have never made any payment under the guarantees. Alternatively, defendants argue that plaintiffs are otherwise actually better off under the currently restructured loan agreements than they would have been under the prior loan terms, and thus cannot demonstrate injury and damages.

In the complaint, plaintiffs allege that Hurley and Rhoads & Sinon are liable for legal malpractice under tort and contract theories (Counts I, II), and for breach of

contract (Counts III, IV).  Plaintiffs have also alleged that all Defendants are liable for unjust enrichment (Count V).

### A.    Overview of the Parties

#### 1.    *Lefta Associates, L.P. ("Lefta")*

Plaintiff Lefta Associates, L.P. is a Washington, D.C. limited partnership, which is owned as follows:  Lefta Associates, Inc. (100% of which is owned by the Auger Trusts), holds a .87% general partnership interest; the Lulu H. Auger Trust holds an 86.13% Class "A" limited partnership interest; and Thomas Lee and Jere Gulau each holds a 6.5% Class "B" limited partnership interest.  Lefta was originally formed to hold an Embassy Suites Hotel, but has since been used to hold various other real property owned by the Augers.  (Doc. 152, Plaintiff's Statement of Facts, ¶ 3) (hereafter "Plfs' SMF ¶ __".)

Thomas Lee is the CEO of USA Management, an entity affiliated with the Lefta and Auger Trusts, which the trusts use to manage certain of their properties, including the Gateway Gettysburg.  (Plfs' SMF ¶ 4.)  Until she died in December 2011, Lulu Auger was the president of Lefta Associates, Inc., the general partner of Lefta.

2.    *The Auger Trusts*

The Ulysses G. Auger Trust and the Lulu H. Auger Trust (the "Auger Trusts") were revocable trusts organized under the laws of the District of Columbia, which became irrevocable trusts following the deaths of Mr. and Mrs. Auger.[2]  Until her death, Lulu Auger was the sole trustee of both of the Auger Trusts.  The successor trustees are Dina Economides, Frank Economides, and Jeffrey Rogers.  (Plfs' SMF ¶ 8.)

3.    *Jack Hurley and Rhoads & Sinon, L.L.P.*

Jack Hurley has been a real estate and transactional attorney with the Harrisburg law firm Rhoads & Sinon since 1980, and a partner since 1985.  In this capacity, Mr. Hurley has long represented Robert Monahan, a real estate developer. In 2001, Monahan, through an entity he controlled,  acquired the 100 acres in Adams County on which the Gateway Gettysburg project was to be situated.  Mr. Hurley

---

[2]  By way of further background, the late Ulysses G. "Blackie" Auger was a successful real estate developer in Washington, D.C. area.  Mr. Auger was born in 1921, who after serving in World War II, opened a small restaurant in Washington, D.C., together with his wife, Lulu.  The Augers later opened a restaurant that became a Washington, D.C. landmark, "Blackie's House of Beef." The Augers subsequently expanded into other real estate ventures, primarily in hotels and restaurants.  The Augers three children, Gregory, Ulysses, and Dina, also became involved in the family business of owning and managing hotels and restaurants.  The Augers' son, Ulysses, died in June 2009, at the age of 56.  Dina and Gregory continue to be involved in the family businesses.

represented Mr. Monahan with respect to this real estate acquisition. Hurley also owned direct and indirect pieces of each partnership that was formed to purchase and develop aspects of Gateway Gettysburg.[3]

4. *Paxton Land Company*

The Paxton Land Company is a title company and escrow agent wholly-owned by Rhoads & Sinon, and which Hurley used for all Gateway Gettysburg loan closings.

## B. Overview of the Gateway Gettysburg Project

In 2001, Monahan acquired approximately 100 acres of real property in Adams County, Pennsylvania, at the intersections of Routes 30 and 15, near Gettysburg, Pennsylvania. Monahan envisioned that the land could be used profitably to develop a multi-faceted hotel, restaurant, and movie theater project that would be featured as an overnight destination for tourists visiting the historical area, and as a conference center for businesses. This Gateway Gettysburg project also planned to feature the "Fields of Freedom" film that could be shown in the theater, and which would provide a starting point for battlefield visitors.

In 2004, the Augers sold an Embassy Square Suites Hotel for approximately $40 million. In an effort to defer payment of capital gains taxes on the sale, the

---

[3] During oral argument before the court on August 6, 2012, the parties represented that Mr. Hurley had subsequently returned these ownership interests to Mr. Monahan, or otherwise divested himself of his ownership interest.

family looked for opportunities to exchange the proceeds of that sale into other real properties under Section 1031 of the Internal Revenue Code.  One of the properties in which they decided to invest these proceeds was the Gateway Gettysburg project.

The Augers and Monahan negotiated an agreement whereby the Augers would invest in the project as a 25% limited partner, and Monahan would serve as the 75% general partner, and each would hold interests in the land used for the project commensurate with these percentage interests.  The parties agreed that the Auger-affiliated entity, USA Management, would manage the hotels and restaurants being developed.  Tom Lee, USA Management's CEO, led negotiations on behalf of the Augers.

Monahan and the Augers formed separate partnerships to develop and own the different aspects of the Gateway Gettysburg project.[4]  Monahan's holding company and the Augers deeded land from the 100 acres to the hotels, restaurants, and theater

---

[4] The partnership interests formed included: Gateway Gettysburg Hotel Partners, L.P., formed to develop a Courtyard by Marriott Hotel; Gateway Gettysburg Hotel/Conference Center Partners, L.P., formed to develop a Wyndham Hotel; Gateway Gettysburg Restaurant Partners I, L.P., formed to facilitate development of two restaurants; Gateway Gettysburg Theater Partners, L.P. ("Theater Partners"), formed to develop a movie theater; and Gateway Gettysburg Productions, L.P. ("Production Partners"), which was formed to facilitated the production of "Fields of Freedom".  Only the Theater Partners and Production Partners entities, and the loans made to these parties, are directly implicated in the lawsuit before the court.

partnerships, on which those projects were to be built.  Hurley and Rhoads & Sinon drafted the partnership agreements for these projects and entities, and, through Paxton Land Company, closed each of the transactions in which the land was transferred.

Although these ownership interests were subsequently restructured, in 2004-2005, the ownership of Theater Partners was as follows:  Lefta held a 25% limited partnership interest; Gateway Gettysburg Historic Holdings, Inc., the entity that Monahan used to acquire the 100 acres in Adams County, held a 74% limited partnership interest; and Monahan Development, LLC, another Monahan entity, held the remaining 1% general partnership interest.  The ownership of Production Partners was as follows:  USA Management, Inc. held a 25% limited partnership interest; Monahan held a 70.25% limited partnership interest; Jack Hurley held a 3.75% partnership interest; and Monahan Production, LLC held the remaining 1% general partnership interest.[5]

On December 27, 2005, Theater Partners and Production Partners entered into two separate loans with Community Bank – which has since become Susquehanna Bank, the current lender under the loans – to finance the development of the 10-screen movie theater and the "Fields of Freedom" film respectively.  Theater Partners

_____

[5] The parties appear to agree that Mr. Hurley has since divested himself of this ownership interest in Production Partners.

entered into a $10.8 million construction loan agreement, and Productions Partners

entered into a $3.9 million term loan.[6]

Plaintiffs and Hurley understood that the trusts had agreed to provide a limited

guaranty under the loans that would be capped at a total 25% of the outstanding loan

balance under each loan.[7]   As it turns out, the language used in the guaranty provision

in each loan obligated the Plaintiffs to 50% of the outstanding balances.   Plaintiffs

informed Hurley of their concerns about the language in the loan documents prior to

closing.   Nevertheless, despite Hurley having been made aware of the problem;

despite Hurley having undertaken to draft a form of certification to clarify the

questions that had arisen regarding the guarantees; despite Hurley's alleged

agreement to obtain from Community Bank a signed certification that would clarify

that the Auger entities' collective guaranty was limited to 25%; and despite Tom

Lee's representation to Hurley that Mrs. Auger would not release the guarantees until

---

[6] Each of the other partnerships entered into separate lending arrangements to finance their respective pieces of the Gateway Gettysburg project for the development of hotels and restaurants.  Because these loans are not directly at issue in this lawsuit, it is unnecessary to describe them in further detail here.

[7] Indeed, it appears that Community Banks' counsel had also agreed to the 25% guaranty limitation prior to closing by approving the certifications that Hurley drafted to clarify the questions that had arisen regarding the scope of the guarantees, but this agreement was ultimately never incorporated into the loan documentation so as to clarify the limited scope of plaintiffs' liability under the loans.

Community Bank had provided the certification to clarify the guaranty concerns, Hurley never obtained a signed certification from Community Bank, and he facilitated the loan closings that were later construed by the bank to obligate the plaintiffs to a 50% guarantee under the loans.   None of the parties seemingly was aware that the certifications had not been signed prior to closing, and discovery of this fact did not occur until more than two years later as this project began to falter.

### C.     The Theater and Production Loans Encounter Difficulties

In 2008, around the time the overall economy was entering into recession, the Theater Partners and Productions Partners became unable to cover their debt service obligations under both the Theater and Productions Loans.   As a result, Monahan sought capital contributions from the partners in order to remain current on the loans. The partners, including Lefta, began paying these capital contributions in proportion to their partnership interests.[8]

In October 2008, however, Monahan refused to continue making further capital contributions for his 75% share of the debt service, and the loans went into arrears.

---

[8] In addition, the plaintiffs were able to successfully negotiate an agreement with Susquehanna Bank – the successor to Community Bank – whereby the bank agreed to credit the plaintiffs' 25% share of the debt service payments as dollar-for-dollar reductions of their guaranty obligations under the loans.  This agreement was a modification of the original loan terms, which provided that the guarantees were reduced only when debt service payments were made by the borrowing entities.  This modification in the loan terms thus benefitted plaintiffs.

Susquehanna Bank did not formally declare a default under the loans, but plaintiffs have pointed to evidence to show that starting in December 2008, the bank was demanding payment on the guarantees and was threatening foreclosure if plaintiffs did not honor their 50% guarantees.  (Plfs' SMF ¶¶ 224(c), (d), and 261.)

Furthermore, Monahan's refusal to continue paying down the debt forced the plaintiffs to fundamentally re-evaluate carefully how to proceed under the troubled loans and projects.  Plaintiffs assessment, which utilized the assistance of legal and financial counsel, resulted in consideration of a menu of different options, including (a) walking away from the project; (b) staying in the project; (c) dividing up the assets between the Augers and Monahan; (d) seeking new investors; (e) restructuring the loans with the banks; or (f) some variations of the above.  Ultimately, following advice by legal counsel and financial advisors, the Augers engaged in talks with Susquehanna Bank to renegotiate the loans, and with Monahan to restructure the ownership interests of the Theater and Productions Partners.

## D.   The Theater and Productions Partnerships and Loans are Restructured

On or around June 1, 2010, the Augers, Monahan, and Susquehanna Bank finalized the restructuring of the loans and the partnership agreements.  Pursuant to these negotiations, Monahan diluted his equity position, and now owns 25% of the

Gateway Gettysburg partnerships, the Augers' interests control 75%, and an Auger entity serves as the general partner in each partnership.

At the time of the restructuring, the Theater Loan had a balance of approximately $9.7 million and the Productions Loan had a balance of approximately $1.8 million. In addition to other modifications, the Theater and Productions Loans were extended another five years, with a $7.9 million balloon payment due in May 2015, and the monthly loan obligations under the loans was reduced from $130,000 to $94,000.

Notably, Susquehanna Bank has remained fixed and unwavering in its interpretation that the Augers' guaranty obligations under the original loan terms collectively amounted to 50%, and the bank insisted on including this level of guaranty when restructuring the loan terms in 2010. The plaintiffs thus continue to have guaranty liability under the modified loans, which at the time of briefing on the pending motion amounting to approximately $460,000 on the Productions Loan and $4 million on the Theater Loan.

The modified loans also provide for dollar-for-dollar reductions in the guarantees, and other provisions that limit the ability of the bank to seek payment under the guarantees if certain payment thresholds are met over a period of years. The loan modification further provides that capital contributions made in relation to

any of the Gateway Gettysburg partnerships earns a preferred rate of 8%, and entitled the plaintiffs to a priority distribution of the preferred return and all capital contributions before any distribution would be made to the partners in proportion to their partnership interests.

According to defendants, the plaintiffs have remained current with their loan obligations, and neither loan is in default; plaintiffs do not appear to dispute that assertion.   However, plaintiffs contend that the erroneous inclusion of the 50% guaranty obligation has caused them injury, which limited their options under either of the loans both before and after they were restructured – indeed, they maintain that one of the conditions to the restructure was that the 50% guaranty remain part of the loan terms.   Moreover, plaintiffs characterize the business prospects for the Theater and Productions projects as dismal, and anticipate that the projects may ultimately fail by the end of 2012.

### E.   Summary of Plaintiff's Claims

The dispute in this case relates only to Lefta's and the Auger Trusts' original guarantees of the Theater and Production Loans.   In short, plaintiffs allege that Hurley was serving as their lawyer in connection with these loan negotiations and closings, and plaintiffs claim defendants are liable for (1) failing to obtain signed copies of certifications from Community Bank clarifying that the plaintiffs' collective

obligation under these loans was limited to 25% of the outstanding loan balances; and (2) delivering the loan documents to Community Bank, and facilitating the loan closing, without first obtaining copies of the certifications from the bank attesting to the 25% guaranty cap to which the plaintiffs agreed.

On the basis of these contentions, plaintiffs have brought claims for legal malpractice under both tort and contract theories of liability, breach of contract claims unrelated to legal malpractice, and for unjust enrichment.

## II.    **PROCEDURAL HISTORY**

Plaintiff's commenced this action on December 16, 2009. (Doc. 1.) Plaintiff's answered the complaint on January 26, 2010. (Doc. 10.)  Nearly 11 months later, defendants filed an amended answer to the complaint in order to correct certain factual allegations, modify one affirmative defense, and to add three additional affirmative defenses invoking the statute of limitations and the doctrines of waiver and estoppel, bringing the total affirmative defenses asserted to 15. (Doc. 39.)

The following month, on December 10, 2010, defendants filed a motion for leave to file a second amended answer. (Doc. 45.) In their motion, defendants sought permission to, *inter alia*, incorporate in their answer a factual denial that plaintiffs have sufficient capacity to maintain their claims, and to include an affirmative defense that they lack such capacity. (Doc. 44.) Over plaintiffs' objection, the court

granted defendants leave to amend. (Doc. 45.)  Thereafter the parties engaged in discovery and other pretrial litigation, which resulted in defendants moving for summary judgment on February 1, 2012.  (Doc. 135.)  The motion is fully briefed, (Docs. 137, 148, 149, 150, 151, 152, 153, 158, 163.).  The briefs alone exceed 200 pages, and the parties have offered thousands of pages of documents and other record evidence in support of their respective positions.

Following this substantial briefing on the summary judgment motion, plaintiffs filed a separate motion for leave to substitute the trustees of the Auger Trusts, and Lefta's partners, as the named plaintiffs in this action, pursuant to Rule 17 of the Federal Rules of Civil Procedure in order to comply with Pennsylvania law of capacity, (Doc. 159.), and this motion is also fully briefed, (Docs. 165, 166, 167, 168, 172, 174.).  Because this motion overlaps one of the arguments made in defendants' motion for summary judgment, and because the parties agree that this issue is potentially case dispositive, we will include a recommended disposition of this motion in this report and recommendation.

## III.   <u>STANDARD OF REVIEW</u>

Rule 56(a) of the Federal Rules of Civil Procedure provides as follows:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant

16

> summary judgment if the movant shows that there is no
> genuine dispute as to any material fact and the movant is
> entitled to judgment as a matter of law.  The court should
> state on the record the reasons for granting or denying the
> motion.

Fed. R. Civ. P. 56(a).[9]  For purposes of Rule 56, a fact is material if proof of its

existence or nonexistence might affect the outcome of the suit under the applicable

substantive law.  Haybarger v. Laurence Cnty. Adult Prob. & Parole, 667 F.3d 408,

412 (3d Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986)).  For an issue to be genuine, "all that is required is that sufficient evidence

supporting the claimed factual dispute be shown to require a jury or judge to resolve

the parties' differing versions of the truth at trial."  Id. (quoting Anderson, 477 U.S.

at 248-49).

Accordingly, in support of a motion for summary judgment, the moving party

must show that if the evidence of record were reduced to admissible evidence in

court, it would be insufficient to allow the non-moving party to carry its burden of

proof.  See Celotex v. Catrett, 477 U.S. 317, 323 (1986).  Provided the moving party

---

[9]  The rule providing for summary judgment was previously set forth in Rule
56(c) of the Federal Rules of Civil Procedure, with some minor differences in the
language then used.  The rule was amended in December 2010 to provide for the
summary judgment standard in Rule 56(a), and by replacing the word "issue" with
"dispute," which "better reflects the focus of a summary-judgment determination."
Rule 56, Advisory Committee Notes.

has satisfied this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007).  Instead, if the moving party has carried its burden, the non-moving party must then respond by identifying specific facts, supported by evidence, which show a genuine issue for trial, and may not rely upon the allegations or denials of its pleadings.  See Martin v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007); see also Fed. R. Civ. P. 56(c).

In adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, Anderson, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party, Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true.  Id.  Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  Anderson, 477 U.S. at 252; see also Big Apple BMW, 974 F.2d at 1363.  In reaching this determination, the Third Circuit has instructed that:

18

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the factfinder to ascertain the believability and weight of the evidence.

Id.  In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted); NAACP v. North Hudson Reg'l Fire & Rescue, 665 F.3d 464, 476 (3d Cir. 2011).

## IV.   **DISCUSSION**

Defendants have raised a number of arguments in support of their motion for summary judgment, which will be addressed separately below.  The first of these issues concerns plaintiffs' capacity to bring the instant lawsuit, and directly implicates plaintiffs' pending motion for leave to ratify and substitute under Rule 17 of the Federal Rules of Civil Procedure.  The parties agree that this threshold issue is both fundamental and potentially dispositive, and thus we address it at the outset of our discussion.

## A.     Substitution - Rule 17(a)

Defendants contend that plaintiffs – two trusts and a limited partnership – lack the capacity to sue because the plaintiffs have improperly sued in the name of the trusts and the partnership, rather than through the trustees and partners.  Defendants note that they placed plaintiffs on notice about this pleading defect through a factual denial and affirmative defense asserted in the second amended answer to the complaint, and again in their motion for summary judgment.  Plaintiffs have recently taken steps to cure what they apparently concede was a formal pleading error by moving for leave for the partners and trustee to ratify and substitute themselves as plaintiffs under Rule 17 of the Federal Rules of Civil Procedure.

Although they candidly conceded at oral argument that they would not, in fact, be prejudiced by this substitution, defendants urge the court to grant summary judgment in their favor, or to otherwise deny the motion to substitute, on the grounds that plaintiff's pleading mistake was unreasonable, and because they failed to correct the problem within a reasonable period of time.

Because we do not find that plaintiffs unreasonably delayed in seeking this relief, and because we find that the interests of justice plainly militate in favor of permitting the substitution of plaintiffs in a manner that would be purely formal, and which would have no material impact on the complaint's factual allegations so as to

alter the events or the participants.  We thus will recommend that the court deny

defendants' motion for summary judgment on this ground, and permit plaintiff leave

to substitute the proper plaintiffs to sue on behalf of the trusts and the partnership.

In accordance with Rule 17 of the Federal Rules of Civil Procedure,

Pennsylvania law governs the parties' capacity to sue or be sued.  Fed. R. Civ. P. 17.

Defendants maintain that under Pennsylvania law, a trust cannot sue in its own

capacity, but instead must bring suit through its trustee.  See Porter v. Hayes, 142 A.

282, 283 (Pa. 1928); Pa. R. Co. v. Duncan, 5 A. 742, 746 (Pa. 1886).  Likewise,

defendants contend that in Pennsylvania a partnership does not have capacity to sue

on its own behalf, but must instead bring suit in the name of the partners.  Pa. R. Civ.

P. 2127(a); see also In re Lawrence County Tax Claim Bureau, 998 A.2d 675, 680

(Pa. Commw. Ct. 2010).

Plaintiffs appear to concede that they commenced this action improperly in the

name of the trusts and the partnership, rather than through the trustees and partners.

Plaintiffs did include factual averments in the complaint clearly identifying the

trustees and the partners, but for formal purposes, plaintiffs brought suit in the name

of the trusts and the partnership.  This, they now apparently acknowledge, was error,

and they have moved for leave to have the trustees and partners ratify the lawsuit and

be substituted as the plaintiffs and real parties in interest.

The issue is what effect this technical pleading defect should have at this point in the litigation – litigation that has spanned nearly three years, which involves disputed claims amounting to millions of dollars, and which involve sophisticated parties – where it is agreed that the pleading error has posed no prejudice of any kind to defendants.

Under Rule 17(a)(1), "[a]n action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a)(1). However, Rule 17(a)(3) of the Federal Rules of Civil Procedure provides an express limitation on the power of a court to dispose of an action when it has not been brought by the real party interest:

> ***Joinder of the Real Party in Interest.***  The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

Fed. R. Civ. P. 17(a)(3).  Thus, although actions must be prosecuted in the name of the real party interest, the rules also prevent courts from dismissing actions simply because a plaintiff is not the proper party in interest, or lacks capacity to sue, until a reasonable period of time has been provided to ratify, or to be substituted into the action, once an objection is made.  Once such substitution occurs, the action proceeds in the normal course.  Id.

The purpose of Rule 17's requirement that an action be brought in the name of the real party in interest is "to enable the defendant to present his defenses against the proper persons, to avoid subsequent suits, and to proceed to finality of judgment." Wright, Miller & Kane, Federal Practice & Procedure, 3d ed. § 1541.  The Third Circuit has interpreted Rule 17(a)(3) to "prevent forfeiture of an action when determination of the right party to [bring suit] is difficult or when an understandable mistake has been made."  Gardner v. State Farm Fire & Cas. Co., 544 F.3d 553, 563 (3d Cir. 2008) (quoting U.S. ex rel. Wulff v. CMA, Inc., 890 F.2d 1070, 1074 (9th Cir. 1989)).

One leading treatise on the civil rules has recognized that "a literal interpretation of Rule 17(a)(3) would make it applicable to every case in which an inappropriate plaintiff has been named" and for this reason recommend that "the rule should be applied only to cases in which substitution of the real party in interest is necessary to avoid injustice."  6A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1655, at 415 (2d ed. 1990).  "What constitutes reasonable time 'is a matter of judicial discretion and will depend on the facts of each case.'"  Killmeyer v. Oglebay Norton Co., 817 F. Supp. 2d 681, 690 (W.D. Pa. 2011) (quoting Schafer v. Decision One Mortgage Corp., No. 08-5653, 2009 WL 1886071, at *6 (E.D. Pa. June 30, 2009).  Furthermore, as one circuit has

recognized, "Rule 17(a) substitution of plaintiffs should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegation as to the events or the participants." Advanced Magnetics v. Bayfront Partners, Inc., 106 F.3d 11, 20 (2d Cir. 1997).

In consideration of the foregoing legal authorities, and applying them to the facts of this case, defendants motion for summary judgment should be denied on the grounds that plaintiffs simply failed to bring suit in the name of the partners of Lefta, and in the names of the trustees of the Auger Trusts. Defendants concede that they will not be prejudiced by allowing substitution at this stage of the litigation, and acknowledge that nothing about the merits of this case will change as a result. Defendants are not in jeopardy of losing claims that they wished to bring against any party or potential party, and there is no risk that any judgment obtained will not be subject to *res judicata* in theoretical future litigation. Substitution, therefore, would merely correct a pleading defect that would not alter the facts or issues raised in this action, or put defendants in an unfair position of litigating against new claims or previously unknown, new parties. Not only was plaintiffs' mistake substantively immaterial for purposes of this action, but the complaint did, in fact, put defendants on notice regarding the trustees and partners in each entity. In addition, defendants concede they have never been in doubt about the identities of these parties since the

litigation commenced, and have taken no steps to assert any claims against any of the trusts, trustees, partnerships, or partners.

Furthermore, our recommendation is guided by the fact that the court enjoys broad discretion to permit substitution, and to determine whether substitution should be permitted in accordance with the requirements of Rule 17 that the request for substitution be reasonable in time, and as a result of a reasonable mistake.  In this case, it is submitted that the court should exercise its discretion to permit substitution in this case, construe the reach of Rule 17 in accordance with the cardinal admonition set forth in Rule 1 that the Federal Rules should be "construed and administered to secure the just . . . determination of every action and proceeding," and deny defendants' motion for summary judgment on this procedural ground, and grant plaintiffs' motion for leave to substitute pursuant to Rule 17.[10]

---

[10]  We are constrained to make a final comment with respect to defendants' contention that another case of this court, Selective Way Insurance Company v. Gunnebo Johnson Corp., No. 1:10-CV-422, 2010 WL 5653471 (M.D. Pa. 2010) (Jones, J.) (Prince, M.J.) is "completely dispositive" of this issue.  (Defs' Reply Br. at 2.)  As an initial matter, it must be emphasized that the court enjoys broad discretion to permit substitution under Rule 17, is not bound by the result reached in another case involving distinct facts and different parties, and we conclude that in the exercise of that discretion substitution should be permitted in this case, according to its facts.  The factual posture of the instant action is distinguishable from that at issue in Selective Way, and we find that the facts and posture of this action plainly militate in favor of permitting substitution in order to allow this action to be resolved on its merits and not on a pleading technicality.

**B.      Statute of Limitations**

Next, defendants assert that plaintiff's claims for legal malpractice sounding in tort were brought after the statute of limitations governing these claims expired. Plaintiffs have brought legal malpractice claims under both contract and tort theories of liability.  (Doc. 1, Counts I and II.)   Under Pennsylvania law, malpractice tort claims are subject to a two-year statute of limitation, 42 Pa. Cons. Stat. Ann. § 5524, whereas contract claims that sound in malpractice are subject to a four-year limitations period, 42 Pa. Cons. Stat. Ann. § 5525.  As part of an incremental attack on each of these claims defendants first argue that under a tort theory, plaintiffs' claims are untimely, since the alleged breach occurred on December 27, 2005, nearly four years before this case commenced.

"Pennsylvania favors strict application of statutes of limitations."  Knopick v. Connelly, 639 F.3d 600, 606 (3d Cir. 2011) (citing Glenbrook Leasing Co. v. Beausang, 839 A.2d 437, 441 (Pa. Super. Ct. 2003)).  "Whether a statute has run on a claim is usually a question of law for the trial judge, but where the issue involves a factual determination, the determination is for the jury."  Knopick, 639 F.3d at 607 (citations omitted).

In a case addressing the event that triggers the statute of limitations in the context of a legal malpractice action, the Third Circuit summarized as follows:

> The trigger for the accrual of a legal malpractice action is not the realization of actual loss, but the occurrence of a breach of duty. <u>Wachovia Bank, N.A. v. Ferretti</u>, 935 A.2d 565, 572, 2007 PA Super 320 (Pa. Super. Ct. 2007). Under the occurrence rule, "the statutory period commences upon the happening of the alleged breach of duty." <u>Id.</u> at 572 (quoting <u>Robbins & Seventko Orthopedic Surgeons, Inc. v. Geisenberger</u>, 449 Pa. Super. 367, 674 A.2d 244, 246-47 (Pa. Super. Ct. 1996)). Where a plaintiff could not reasonably have discovered his injury or its cause, however, Pennsylvania courts have applied the discovery rule to toll the statute of limitations. Wachovia, 935 A.2d at 572-74 (citing <u>Pocono Int'l Raceway v. Pocono Produce, Inc.</u>, 503 Pa. 80, 468 A.2d 468, 471 (Pa. 1983)). Where the discovery rule does apply, the two-year period on legal malpractice actions begins to run where the plaintiff knew or in the exercise of reasonable diligence should have known of the injury and its cause. <u>Crouse v. Cyclops Indus.</u>, 560 Pa. 394, 745 A.2d 606, 611 (Pa. 2000).

<u>Id.</u> Thus, as construed by the United States Court of Appeals for the Third Circuit, Pennsylvania law holds that claims for legal malpractice run from the moment of the alleged breach, but Pennsylvania law also recognizes an exception to the occurrence rule in legal malpractice cases known as the "discovery rule," which applies "when the injured party is unable, despite the exercise of diligence, to know of his injury or its cause." <u>Id.</u> at 609 (footnote omitted)[11]. Where applicable, "the discovery rule tolls

---

[11]     For their part, the plaintiffs have advanced a nuanced argument under Pennsylvania law that the statute of limitations for a legal malpractice action does not begin to run until the breach of duty causes harm. (Doc. 151, pp. 30-34.) On the basis of this carefully constructed legal edifice the plaintiffs invite us to reject the plain teaching of the United States Court of Appeals for the Third Circuit in

the running of the statute of limitations until a plaintiff is put in a position to discover the injury and its cause, either through inquiry or retention of a new lawyer." <u>Id.</u> Even in such a case, however, "[k]nowledge may also be imputed to plaintiffs when an adverse action is taken against them, be it through a court order or through a third party action, thus initiating the running of the statute of limitations at that time." <u>Id.</u>

A plaintiff bears the burden of proving that the discovery rule applies to a given claim. <u>See</u> <u>Smith v. Carey Canadian Mines, Ltd.</u>, 609 F. Supp. 639, 642 (E.D. Pa. 1985). The standard of reasonable diligence that a plaintiff must demonstrate in discovering a claim is an objective one. <u>See</u> <u>Dalrymple v. Brown</u>, 701 A.2d 164, 167 (Pa. 1997). If "something exists to trigger inquiry, then the plaintiff must demonstrate that he conducted an investigation, and despite doing so, did not discover his injury." <u>Knopick</u>, 639 F.3d at 612 (internal citations omitted).

In this case, defendants contend that any breach of legal duty occurred in late December 2005, when the issue regarding the certifications arose, and when plaintiffs allege Hurley breached his legal obligations to them to ensure that the certifications were signed, and that the closing did not occur until such time as they had been

---

<u>Knopick</u> . As a lower federal tribunal that is subject to the faithful application of the law as construed by higher courts, we will decline this invitation.

executed and incorporated.  Thus, as a threshold matter, defendants argue that the statute has long since run on these claims.

Defendants also assert plaintiffs should have reasonably known that the guaranty certifications from Community Bank were not signed or made part of the loan closings by February 2006,when plaintiffs received copies of the executed loan documents.  Defendants contend that the absence of the guaranty certifications was, at minimum, sufficient to trigger a duty to exercise reasonable diligence to discover any failure to act on the part of defendants.

In addition, defendants argue that plaintiffs were on reasonable notice of the issues regarding the certifications, not only because plaintiffs had raised the issue immediately prior to the loan closings and, but also because a similar issue had arisen with respect to the loan taken out in 2004 to fund construction of the Courtyard by Marriott Hotel that was erected as part of the Gateway Gettysburg project. Defendants thus argue that the claims are untimely regardless of whether the discovery rule is applied, because even if the discovery rule applies, plaintiffs have failed to show that they conducted any investigation despite having had good reason to do so.

For their part, plaintiffs argue that the statute of limitations did not run until 2009, when they suffered harm by first making payments on the Productions and

Theater Loan guaranties.[12]  Plaintiffs argue that until that time, there was only the theoretical possibility that they would have to pay, and thus plaintiffs were not injured, and the statute could not have begun to run.  We disagree with plaintiffs' suggestion that the statute of limitations did not begin to run until plaintiffs were actually injured in 2009, since we find that under Knopick and Pennsylvania law, legal malpractice claims begin to run from the moment of the alleged breach.

However, plaintiffs also argue that even if the "occurrence" rule applies, there are disputed issues of fact that exist with respect to whether plaintiffs reasonably should have discovered defendants' alleged negligence, and the question of whether the discovery rule applies to save plaintiffs' claims should await consideration by a jury.

Upon due consideration, we agree with plaintiffs that disputed questions of fact exist with respect to whether and when the discovery rule applies to this tort claim for malpractice, and as to whether plaintiffs should reasonably have been expected to investigate and discover Hurley's alleged breach of duty by failing to have obtained signed copies of the guaranty certifications from the bank prior to closing the

---

[12] Defendants have taken the position that plaintiffs have never, in fact, made payments under the guarantees.  As will be discussed below, we conclude that whether payments that plaintiffs have made over the course of the original and restructured loans may be considered guaranty payments involve questions that turn on disputed issues of material fact.

transactions, or in permitting the loans to close before ensuring that the certifications were incorporated into the loans. To be sure, there are arguments favoring both sides with respect to the running of the statute of limitations, as reflected in the commendable briefs filed by both defendants and plaintiffs, and as reflected during the spirited argument held before the court on August 6, 2012.

By way of one example, we note that defendants have argued that the facts show plaintiffs were concerned about the potential exposure under the guarantees, and had specifically brought this issue to Hurley's attention immediately prior to the loan closings. Defendants thus contend that plaintiffs had good reason to examine the loan documents when they received copies of the closing binder in February 2006, to satisfy themselves that the guarantees were appropriate and, if not, to bring suit within the two year limitations period.

In contrast, plaintiffs observe that they had good reason to believe that Jack Hurley was looking out for their interests in connection with this transaction, and that he had provided them with assurances that the matter had been satisfactorily addressed. For this reason, plaintiffs maintain that it would be unreasonable to blame them as legal clients for failing to inspect the transaction documents in February 2006 after being reassured by the person they believed was serving as their legal counsel during this loan closing. Furthermore, plaintiffs point to facts suggesting that even

Mr. Hurley remained entirely unaware of the omission of the certifications, and the inclusion of language exposing plaintiffs to a 50% aggregate guaranty, until sometime in 2008, when Mr. Hurley inspected the loan documents and first discovered that the certifications were not included.  Plaintiffs thus suggest that since Hurley was the lawyer in charge of these documents, and yet was unaware for years of the omission, it would arguably be unreasonable to expect plaintiffs to discover it on their own.

In cases where a court concludes "that a jury could disagree as to whether [a plaintiff] reasonably knew or should have known of his injury [by a date certain]," summary judgment is inappropriate.  Knopick, 639 F.3d at 616.  Furthermore, there are examples from Pennsylvania caselaw that provide substantial support for entrusting to a jury questions regarding whether a client's failure to discover an attorney's breach was reasonable.  See, e.g., Glenbrook Leasing Co. v. Beausang, 839 A.2d 437 (Pa. Super. Ct. 2003) (where error in agreement of sale for office space in condominium complex was not discovered until six years after the sale, court found that it was unreasonable for clients to have discovered the omission of parking spaces as part of the deed, where the parking spaces had been included in the agreement of sale); Robbins & Seventko Orthopedic Surgeons, Inc. v. Geisenberger, 674 A.2d 244 (Pa. Super. Ct. 1996) (in case where attorneys negligently prepared pension plan documents in 1977, but the error was not brought to clients attention until 1983, the

court found it would be unreasonable to expect plaintiffs to have discovered the error, and their injury, until they were notified about it in 1983). These cases suggest, at minimum, that any question about whether plaintiffs should have had reason to discover – or even investigate – the omission of the bank certifications in 2006 should await the factfinder's consideration of the evidence.

Without expressing any further opinion as to the strengths of the parties' arguments or construction of the facts as to this issue, we conclude that disputed issues of fact remain with respect to whether plaintiffs' claim for legal malpractice sounding in tort was timely filed, and such disputes should await resolution by a jury.

### C.     Jack Hurley's Alleged Legal Representation of Plaintiffs

Defendants next contend that there are insufficient facts to support plaintiffs' allegations that Jack Hurley was, in fact, serving as plaintiffs' legal counsel with respect to general or discrete matters in connection with the Theater or Productions Loans. Since an attorney-client is a prerequisite to any claim for legal malpractice, defendants contend that plaintiffs' malpractice claims in Counts I and II of the complaint necessarily fail.

Plaintiffs respond by citing to numerous factual disputes in the evidentiary record that demonstrate what they argue was an objectively reasonable belief that Mr. Hurley had undertaken their legal representation with respect to obtaining the

certifications from the lender, and that he was continuing to serve as their lawyer when he facilitated the loan closing without having first obtained executed copies of the certifications that he drafted.  We agree with plaintiffs that disputed questions exist that make summary judgment unwarranted on this ground, which is plainly dependent on numerous factual issues that the parties hotly dispute, and which have divergent supporting evidence in the record.

In order to maintain a claim for legal malpractice under Pennsylvania law, a plaintiff must first demonstrate that an attorney-client relationship existed.  In order to satisfy this requirement, a plaintiff need not prove the existence of a fee-for-service or other written contract; instead, the law will recognized implied attorney-client relationships where the facts demonstrate that such a relationship existed.  Plaintiffs maintain that the facts of this case warrant such a finding.

The Pennsylvania Superior Court has explained the relevant factors to be considered in determining whether an implied attorney-client relationship exists:

> The law which governs the practice of law in this Commonwealth does not require a traditional fee-for-service contract to be executed between an attorney and a prospective client to create an attorney-client relationship. See, e.g., Minnich v. Yost, 817 A.2d 538, 542 (Pa. Super.2003).  Absent an express contract, an implied attorney-client relationship will be found if the following are shown: (1) the purported client sought advice or assistance from the attorney; (2) the advice sought was

34

> within the attorney's professional competence; (3) the attorney expressly or impliedly agreed to render such assistance; and (4) it was reasonable for the putative client to believe the attorney was representing him. *Id.,* 817 A.2d at 542 (citation omitted).

Capital Care Corp. v. Hunt, 847 A.2d 75, 83 (Pa. Super. Ct. 2004).   Interpreting

Pennsylvania law, the Third Circuit has summarized:

> an implied attorney-client relationship is shown if (1) the purported client sought advice or assistance from the attorney; (2) the assistance sought was within the attorney's professional competence; (3) the attorney expressly or impliedly agreed to provide such assistance; and (4) it is reasonable for the putative client to believe that the attorney was representing him. Atkinson v. Haug, 424 Pa.Super. 406, 622 A.2d 983, 986 (1993). A request for legal services, and an agreement to provide legal services, are necessary elements to form an attorney-client relationship. Cost v. Cost, 450 Pa.Super. 685, 677 A.2d 1250, 1254-55 (1996).

Capitol Surgical Supplies, Inc. v. Casale, 86 F. App'x 506, 508 (3d Cir. 2004).[13]   It

is the reasonableness of the client's belief that the attorney is providing legal services

pursuant to an attorney-client relationship that controls this issue, not the attorney's

own belief.   Hunt, 847 A.2d at 83.   In our view, this four-part test is one which

---

[13] In addition, the Pennsylvania Supreme Court has held that without "strict privity," a legal malpractice claim brought by a third party may require "a specific undertaking on the attorney's part to perform a specific service for [the] third party, coupled with the reliance of the third party and the attorney's knowledge of that reliance . . . ." Guy v. Liederbach, 459 A.2d 744, 749 (Pa. 1983).

entails the weighing of a host of factual matters, and thus is often ill-suited for summary judgment. Nonetheless, defendants argue that the foregoing elements are not satisfied in this case, and insist that the plaintiffs never sought assistance from Hurley specifically to obtain signed copies of the bank's certifications regarding the loan guaranty issues that had arisen in late 2005, or to withhold delivery of the loan documents until signed copies of the certifications were obtained.

In this regard, defendants assert that Hurley was serving as a mere pass-through between the bank and Richard Levin, Esq., a Washington, D.C. lawyer who was also providing limited services to the Augers relating to the Gateway Gettysburg project.[14]

---

[14] Notably, the facts suggest that Levin's role in these transactions may have been limited. Although Levin was asked to provide a legal opinion on whether the trusts could provide the guarantees under the loans, his firm billed only $1,650 for the services rendered to the Augers for this engagement. (Plfs' SMF ¶ 93.) In comparison, plaintiffs have attested that Hurley and Rhoads & Sinon spent over 60 hours working for the partnerships in connection with the loans, and billed the partnerships nearly $11,000 in December 2005 alone. (Id.) Thus, although defendants have suggested that Levin was functioning as the Augers' counsel in connection with the Gateway Gettysburg loans, the facts suggest his role may have been fairly curtailed, and that Hurley's was, in contrast, substantial. Moreover, we do not find the fact that Levin may have performed some legal functions on behalf of the Augers and their entities necessarily leads to the conclusion that Hurley could not also have been providing discrete legal services to the Augers – something he indisputably had done on prior occasions. Indeed, although we find there to be no reasonable dispute that clients at times have multiple counsel, plaintiffs have offered expert testimony who has attested that "[i]t is quite common and, indeed, appropriate for clients to retain multiple attorneys to function as co-counsel on behalf of the client in connection with a single issue or transaction."). (Plfs' SMF App'x 57.)

Defendants maintain that Hurley merely agreed to pass along documents and questions to the bank's counsel, and are adamant that while the parties ultimately approved the guaranty certifications from the banks, Hurley was never asked to obtain copies of them prior to closing the loans. Defendants further insist that Hurley never agreed to obtain signed copies of the guaranty certifications, and it was unreasonable for plaintiffs to believe that Hurley represented them. In support of their motion, defendants have also quoted extensively from Lulu Auger's deposition in which she testified that she believed the Augers were being represented by Richard Levin and not Jack Hurley.

For their part, plaintiffs argue that disputed issues of fact exist regarding the nature of the relationship, and whether it was reasonable for them to have believed that Hurley was serving as their attorney. In support for their position, plaintiffs point to testimony by their agents and Richard Levin, indicating their belief that Hurley was serving as the Auger entities' loan counsel. (Plfs' SMF ¶ 38(i), (j), and (k); ¶ 154.) For example, Greg Auger testified that "Jack Hurley's our lawyer in Pennsylvania. He's supposed to represent our interests." (Id. ¶ 38(i).)

Moreover, plaintiffs point to evidence to show that their belief that Hurley was functioning as their lawyer was not merely subjective, but was objectively reasonable. In this regard, plaintiffs observe that Hurley was providing other legal services to

37

plaintiffs as an attorney in August 2004, December 2004, and September 2005, with respect to other Gateway Gettysburg loans, principally by drafting legal opinion letters for Lefta and the Auger Trusts.  (Plfs' SMF ¶ 38(c), (d), and (e).)  Hurley himself acknowledged that he undertook the responsibility for drafting the "Guaranty Consents" for Lefta to execute with respect to the Theater and Productions Loans.

But perhaps most importantly, plaintiffs also argue that Hurley's actions in December 2005, prior to and contemporaneous with the closing of the Theater and Productions Loans, adds support for their belief that he was functioning as their lawyer.  In this regard, plaintiffs note that during this time Hurley reviewed plaintiffs' guarantees as drafted by the bank, and advised Tom Lee that the guarantees did create a 50% obligation.  (Plfs' SMF ¶¶ 161-182.)

Plaintiffs note that after recognizing this problem, Hurley accepted lead responsibility for drafting certifications that would have corrected the problem, advised Lee that the certifications would correct the guaranty issue, and circulated drafts of the certifications.  However, Hurley proceeded to close the loan transactions without ever obtaining executed copies of the certifications from the bank, even though he later testified to having had the primary responsibility for gathering all of the documents that the banks needed to have signed and which the borrowers and

guarantors were to have signed. (Plfs' SMF ¶ 38(l).) Hurley acknowledged that he alone was responsible for facilitating the closing. (Id.)

We conclude that, although these facts may not compel the conclusion that Hurley was functioning as their counsel, they do constitute facts from which a jury could reasonably conclude that he had undertaken legal representation on their behalf with respect to a discrete but important matter. We disagree with defendants that the facts are sufficiently clear so as to permit summary judgment in their favor on the narrow question about the scope of the legal services that Hurley may have rendered. In this regard, defendants argued in their briefs and at oral argument that although some facts may show that Hurley provided legal services in the form of advice about the guarantees and certifications, there was insufficient evidence to show that Hurley ever was requested to, or accepted responsibility for, obtaining the signed certifications prior to closing. (Defs' SMF ¶ 182.)

In response to this argument, plaintiffs direct the court to evidence showing that Hurley had undertaken to bring the guaranty problem to the bank's attention, and to draft the certifications that were to have clarified the reach of the guarantees under the loans, pursuant to requests made by both Richard Levin and Tom Lee. (Plfs' SMF ¶¶ 174, 170, 184.) We conclude that this evidence is sufficient to create a disputed question of fact as to whether "it was reasonable for [plaintiffs] to believe [Hurley]

was representing them" with respect to having the certifications signed before the loans closed.  <u>Capital Care</u>, 847 A.2d at 83.  Having found that questions of fact exist with respect to this pivotal issue, we conclude that summary judgment is inappropriate on the grounds that there is a lack of evidence to show that an implied attorney-client relationship existed.

### D.    Damages Available For Plaintiff's Claim of Legal Malpractice Sounding in Contract

Next, defendants argue that in Pennsylvania, damages for legal malpractice predicated on a breach-of-contract theory of liability are limited to the amount of legal fees paid to the attorney.  Defendants assert that plaintiffs cannot recover for their claims of legal malpractice based on a breach of contract theory because damages for these claims are limited to legal fees, and here, the plaintiffs did not pay any fees to the defendants.  Defendants rely on <u>Bailey v. Tucker</u>, 621 A.2d 108 (Pa. 1993) for the proposition that it is improper to allow recovery of consequential damages for a legal malpractice claim based on the theory of breach of contract and that damages are "limited to the amount actually paid for the services plus statutory interest." <u>Id.</u> at 115.

Plaintiffs counter by arguing the rule announced in <u>Bailey</u> should properly be limited to claims for malpractice arising out of representation in criminal proceedings.

40

Plaintiffs support this view by noting that the Bailey court announced the limitations on damages after expressly considering the particular problems that are implicated by claims for legal malpractice sounding in *assumpsit* by criminal-defendant clients. Plaintiffs also offer examples of cases where compensatory damages have been awarded to plaintiffs who claimed legal malpractice based on breach of contract. Plaintiffs further argue that the damages in this case were "foreseeable,"were contemplated by "the parties at the time of contracting," and can be "prove[n] with reasonable certainty," which are necessary factors to prove in order to recover damages for breach of contract generally, and which they maintain should be available in this action.  See Condominium Association Court of Old Swedes v. Stein-O'Brien, 973 A.2d 475, 483 (Pa. Comm. Ct. 2009).

Upon review of this question, we first observe that Bailey is a Pennsylvania Supreme Court case involving claims for legal malpractice brought by the claimant based on his attorney's allegedly deficient representation of him in a criminal matter. Although not entirely clear from isolated sections of the opinion, the reasoning employed in Bailey suggests that the limitation on available damages was intended to be restricted to the criminal context.  We thus conclude that some of the lower courts in Pennsylvania state and federal courts that have concluded that Bailey's strict limitation on recoverable damages under a breach-of-contract theory apply also

in civil cases have misinterpreted the Pennsylvania Supreme Court's analysis holding

in Bailey, and failed to consider the particular considerations that informed the

court's decision.

In Bailey, the Pennsylvania Supreme Court held as follows:

> [In anticipation of potential problems it is necessary to comment on the aspect of recoverable damages *in such an action*; quite simply, such damages will be limited to the amount actually paid for the services plus statutory interest. Our reasons for imposing this limitation are the same as those discussed above; to allow consequential damages in such a situation will engender the same problems as those we sought to limit above.

Bailey, 621 A.2d at 114 (emphasis added).  In enunciating this rule, the court

was referring to an earlier section of its opinion in which it found it necessary

to:

> emphasize the unique position which a client accused of a crime occupies *vis a vis* a civil client. Unlike in the civil litigation area, a client does not come before the criminal justice system under the case of his counsel alone; he come with a full panoply of rights, power, and privileges. These rights and privileges not only protect the client from abuses of the system but are designed to protect the client from a deficient representative. Thus, whereas in a civil matter a case once lost is lost forever, in a criminal matter a defendant is entitled to a second chance (perhaps even a third or fourth chance) to insure that an injustice has not been committed. For these reasons we are constrained to recognize that criminal malpractice trespass actions are distinct from civil legal malpractice trespass actions, and as a result the element to sustain such a cause of action must likewise differ.

Id.

We read this language to indicate that the court intended to limit its holding to claims for legal malpractice arising out of the representation of criminal defendants, and thus does not necessarily – or even logically – apply to malpractice occurring in civil matters.   Thus, we find the better reading of the rule announced in <u>Bailey</u> to be that the court was limiting damages in breach of contract malpractice cases specifically because of the important  distinctions between both civil and criminal legal malpractice.   We acknowledge that there have been several decisions in Pennsylvania state courts, and also in federal court, interpreting <u>Bailey</u> to limit damages in both civil and criminal malpractice actions.[15]   However, having reviewed

---

[15] Defendants cite several cases as support for the proposition in <u>Bailey</u> that damages for legal malpractice cases based on a breach of contract theory should be limited to legal fees.  However, we suggest that in these cases the courts have not thoroughly examined the reasoning of <u>Bailey</u>, or have otherwise misapplied the decision.  <u>See</u> <u>Slaughter v. Rushing</u>,, 683 A.2d 1234 (Pa. Super. Ct. 1996)(mentioning <u>Bailey</u> in a footnote); <u>D'Ambro v. Stradley, Ronon, Stevens & Young</u>, 29 Pa. D. & C.4th 88, 93 (Pa. Com. Pl. 1996) <u>aff'd sub nom.</u> <u>D'Ambro v. Stradley</u>, 736 A.2d 18 (Pa. Super. Ct. 1998)(quoting <u>Bailey</u> in dicta); <u>Stacey v. City of Hermitage</u>, 2:02-CV-1911, 2008 WL 941642 (W.D. Pa. Apr. 7, 2008)("Assuming, arguendo, that the assumpsit claim recognized in <u>Bailey</u> applies in the civil context, the Amended Complaint fails to state a claim because damages under such a claim are limited to the amount paid.").  <u>See also</u> <u>Nuyannes v. Thompson</u>, No. 11-2029, 2012 WL 1033912, at *11 (E.D. Pa. Mar. 27, 2012) (limiting malpractice damages under contract theory to amounts actually paid, plus interest); <u>Coleman v. Duane Morris, LLP</u>, No. 0917, 2011 WL 5838278 (Pa. Com. Pl. Nov. 4, 2011) (same).  With respect to this last case, although we similarly find the reasoning of <u>Coleman</u> to be unpersuasive, we understand that <u>Coleman</u> is presently on appeal to the Pennsylvania Superior Court, which will presumably be in a position to interpret the proper reach and limits, if any, of <u>Bailey</u> in the civil

these decisions, we conclude that none persuasively considered whether <u>Bailey</u> is properly limited to the criminal context, which we believe the case to be.

Accordingly, unlike the cases cited above, we find that the court should decline the invitation to read <u>Bailey</u> as a sweeping limitation on the damages that may be recovered in contract-based malpractice civil actions. Instead, the court should acknowledge that "courts have reached difference conclusions as to whether [the <u>Bailey</u>] limitation should apply only in the criminal context," <u>Bayview Loan Servicing, LLC v. Law Firm of Richard M. Squire & Associates, LLC</u>, No. 10-1451, 2010 WL 5211003, at *5 n.12 (E.D. Pa. Dec. 14, 2010), note that this question is presently before the Pennsylvania Superior Court, and conclude that at present the most reasonable interpretation of <u>Bailey</u> is to limit that decision to malpractice claims arising out of representation in criminal proceedings.[16]

---

context. In the event the Pennsylvania Superior Court were to hold that Bailey's rule applies in civil and criminal cases alike, defendants should be permitted to renew their request for summary judgment on plaintiff's contract-based malpractice claim, where plaintiffs did not pay any fees to Hurley.

[16] Furthermore, we observe that other decisions in cases involving legal malpractice claims sounding in contract have permitted plaintiffs to pursue claims for actual damages resulting from the breach, which is precisely what plaintiffs endeavor to do in this case. <u>See</u> <u>ASTech Int'l, LLC v. Husick</u>, 676 F. Supp. 2d 389, 399-400 (E.D. Pa. 2009).

Because we disagree with defendants' interpretation of <u>Bailey</u>, and find that decision is properly limited to the legal representation in criminal cases, we recommend that the court deny defendants' motion for summary judgment on this ground as well.

### D.   Whether Plaintiffs Have Incurred Damages, and Whether Such Damages Were Foreseeable or Within the Reasonable Contemplation of the Parties are Questions of Fact that Should Be Resolved at Trial.

Defendants also argue that summary judgment is warranted on all of plaintiffs' claims because plaintiffs have incurred no damages as a result of defendants' alleged breaches.  In this regard, defendants advance a number of arguments, including a contention that plaintiffs have never actually made payment under the guarantees; that even if plaintiffs did make payments under the guarantees, they have not paid more than the 25% amount to which they originally agreed; that plaintiffs are actually better off under the terms of the restructured loan agreements they entered into in 2010; and that plaintiffs have failed to come forward with sufficient evidence to prove recoverable damages under prevailing Pennsylvania law.  For their part, plaintiffs disagree each of these assertions, and argue that there is sufficient evidence to support plaintiffs' theory of damages to permit these claims to be presented to a jury.

45

Defendants essentially ask the court to find that there is no evidence to support plaintiffs' claim that Hurley's alleged breaches were a significant or substantial factor in the damages allegedly incurred, and that as a result summary judgment is appropriate. Plaintiffs, in turn, point to numerous pieces of evidence that they contend support their theory of liability, and note that summary judgment on questions of whether a defendant's breach was a substantial factor or a substantial cause of injury should be entrusted to a jury unless reasonable minds could not disagree on this matter. Thus, this argument, in our view, presents the paradigm of an essentially factual dispute, albeit one which arises in a complex commercial setting. Upon consideration, we find that disputed issues of fact exist with respect to plaintiffs' damages claims, and thus find that it would be inappropriate for the court to rule upon these issues prior to trial.

The Third Circuit, in interpreting Pennsylvania law, has held that in order to prove causation as a prerequisite to being entitled to damages, a plaintiff must demonstrate both "'cause in fact,' or physical cause . . . [and] 'proximate cause,' or legal cause . . . ." Redland Soccer Club v. Dep't of the Army, 55 F.3d 827, 851 (3d Cir. 1995); Vattimo v. Lower Bucks Hospital, Inc., 465 A.2d 1231, 1233 (Pa. 1983); Ford v. Jefferies, 379 A.2d 111, 113 (Pa. 1977) (plaintiff must show that defendant's act or omission was substantial factor in causing injury). A defendant's act or

omission will be deemed a substantial factor if it is "significant or recognizable". Jeter v. Owens-Corning Fiberglass Corp., 716 A.2d 633, 636-37.   Thus, plaintiffs in this case must prove both the Hurley's alleged breaches were the cause in fact of injury, and also that the alleged breaches were a significant or substantial cause of the harm incurred.

The question of whether legal cause exists is ordinarily one that should be committed to the jury, Ford, 379 A.2d at 595, unless reasonable minds could not differ, in which case a court may make such a determination on summary judgment, Bushman v. Halm, 798 F.2d 651 (3d Cir. 1986).  See also Vattimo, 465 A.2d at 1234 (if "a jury may reasonably differ on whether the defendant's conduct was a substantial factor in causing the injury, generally, the case must go to the jury on those issues.").

With these legal guidelines in mind, plaintiffs maintain that there is substantial evidence to show that defendants' release of the guarantees without first obtaining the bank's signature on the certifications limiting those guarantees to 25% caused plaintiffs to make substantial payments under the guarantees beginning in February 2009, and thereby incurring injury.

As a threshold matter, plaintiffs point to evidence showing that: the guarantees as written committed Lefta and the Trusts to a collective guaranty of 50% of the outstanding loan balances; Hurley acknowledged that the guaranty language created

a collective 50% guaranty; Hurley was responsible for drafting the bank certifications to limit the guarantees under the loans to a collective 25% obligation, but then failed to have the certifications signed prior to releasing the guarantees; the bank threatened to foreclose on the loans unless plaintiffs made guaranty payments equaling 50% of the outstanding debt; and the bank was unshakeable in its insistence that the 50% guaranty remain in place, even after the loans were restructured, thereby ensuring that plaintiffs remain locked into loan agreements that require them to be subjected to twice the guarantee they had agreed to originally.  (Plfs' SMF ¶¶ 50, 172.)  On the basis of these facts, plaintiffs argue that they should be entitled to present their claims to the jury, and seek a finding that Hurley's alleged breach was a significant or substantial factor in plaintiffs being subjected to the 50% guaranty that plaintiffs claim they have been making payments on since 2009.

Plaintiffs also flatly dispute defendants' contention that none of the payments made under the loans have actually been guaranty payments.  In contrast to defendants' arguments that these payments are nothing more than capital contributions, plaintiffs point to evidence showing that beginning in February 2009, each of plaintiffs' payments was accompanied by a signed acknowledgment by plaintiffs and the bank that the payments were guaranty payments.  In addition, plaintiffs contrast the capital contributions made in 2008 under the loans, which were

made by all of the partners in accordance with their respective partnership interests, with the payments made starting in 2009, which were only made plaintiffs as guarantors. Additionally, plaintiffs argue that the payments that were made in 2008 were made pursuant to capital calls by Monahan, whereas it was Monahan's refusal or inability to continue making capital contributions that caused the loans to go into arrears at the end of the year, and which resulted in plaintiffs alone making payments pursuant to the guarantees. (Plfs' SMF ¶¶ 211, 215, 216, 219, 254.)

Upon consideration of defendants arguments, together with the evidence of record supporting plaintiffs' theory of damages and defendants' responsibility for causing the asserted injury, we conclude that there is plainly a dispute regarding causation that should not be decided by the court on the basis of a disputed record as part of a summary judgment motion.

We similarly decline to embrace as a matter of law defendants' additional arguments and theories as to why plaintiffs have not, or perhaps cannot, prevail on their burden to prove causation and damages. Defendants would have the court assess in the first instance plaintiffs' possible motivations to make guarantee payments in order to seize control of the Gateway Gettysburg project through a restructuring, and to find that plaintiffs' restructuring of the loans cut off Hurley's potential liability, since the restructuring materially changed the parties' relationships

and plaintiffs' obligations under the loans. (Doc. 148, at 80-82.) Although we agree with defendants that these facts may bear upon a factfinder's decision as to whether Hurley's conduct was a substantial or significant factor in plaintiffs' claimed damages, we do not find it appropriate to resolve this issue on summary judgment, but instead recommend that the parties be permitted to argue these facts – and their significance – to the jury at trial.

Defendants also point to language in the loan documents to argue that the loans have never technically been in default, and thus none of the payments made to date can properly be considered guaranty payments, or otherwise that plaintiffs have never been obligated to make payments under the guarantees. (Id. at 72.) There is contrary evidence, however, that could show that the bank did not have to declare a default under the loans to require plaintiffs to make guaranty payments, and there is also evidence to support plaintiffs' claim that the banks had threatened foreclosure if plaintiffs' balked at honoring the 50% guarantees that were part of the original loan terms. (Plfs' SMF ¶¶ 220, 224(c), (d), 261.) Without venturing to further parse or analyze the nature of the payments, we find on the substantial record submitted by the parties that there are disputed issues of fact with respect to whether the payments made were guaranty payments, and whether defendants' alleged breaches were a

substantial or significant factor in plaintiffs having to make them.  We thus find summary judgment on this ground to be inappropriate as well.

Next defendants argue that the fact that the loans were restructured in 2010 should be an intervening event that terminates defendants' potential liability. Although we believe this argument may be relevant at trial, we cannot find that it compels summary judgment at this time.  Although the loans were restructured with different terms – some of which appear to have conferred greater potential benefits on plaintiffs – there is also evidence to show that the bank continued to require plaintiffs to honor the 50% guarantee that was erroneously made part of the original loan terms.  (Plfs' SMF ¶¶ 265, 293, 300-01, 310-11.)  Thus, there is some evidence to support plaintiffs' contention that the restated guarantees included in the restructured loans were a consequence of the guarantees that Hurley's negligence allegedly caused to be included in the first place.  Accordingly, we find that this issue also does not admit of resolution on summary judgment, as disputes exist with respect to these facts, their proper interpretation, and their ultimate significance to plaintiffs' claims.

Perhaps defendants' most persuasive argument is that by restructuring the loans, plaintiffs have actually been benefitted and effectively negated any damages that they might have incurred had the loans not been restructured.  (Doc. 148, at 80-

82.)  Plaintiffs seem to agree, to a certain extent, that the restructuring brought with it certain benefits, including a reduction in some guaranty obligations, an extension of the maturity date under the loans, and a reduction in the monthly payments of principal and interest due under the Theater and Productions Loans.  (Plfs' SMF ¶ 284(c), (d); Doc. 151, at 51-52.)  Plaintiffs retort that defendants are improperly confusing plaintiffs' attempts at mitigation with the fact of their injury.  Upon careful consideration, we find that this evidentiary significance of this contested factual issue should also await resolution at trial.

We appreciate that defendants are attempting not merely to discredit plaintiffs' arguments about causation, but more fundamentally to demonstrate that plaintiffs have either not been injured at all, or that their efforts at mitigation have been entirely successful.  However, recognizing our role in addressing a summary judgment motion, and the perogatives of a jury in making factual findings at trial, we continue to find that on either point, these matters should be presented to a jury, which can assess not only whether Hurley's alleged breaches were a substantial or significant factor in plaintiffs' claimed injury, but also the extent of those injuries, and whether some or all were mitigated through the restructuring in 2010.

Plaintiffs will, of course, have the burden of proving not only causation, but the extent of their damages.  Defendants will have an opportunity to counter plaintiffs on

these issues, and to argue that plaintiffs' mitigation efforts succeeded in avoiding any potential injury that might have flowed from defendants' alleged breach.  The parties' voluminous submissions of record evidence, and competing expert reports, are a testament to the disputed nature of these issues, and compel us to find that summary judgment is not warranted on defendants' claims that plaintiffs have entirely mitigated their damages.[17]

In conclusion, we find that questions of fact exist with respect to plaintiffs' claims of injury, whether defendants' actions or omissions were the cause of that injury, and whether plaintiffs mitigated – or failed to mitigate – their claimed damages in this action, making summary judgment inappropriate.[18]

---

[17]  We note that defendants have also made other arguments regarding plaintiffs' mitigation efforts, or lack thereof, and have suggested that plaintiffs claim of causation are foreclosed because they never brought suit against the bank to reform the guarantees.  (Doc. 148, at 82-85.)  Under Pennsylvania law, "mitigation is an affirmative defense, so the burden of proving a failure to mitigate is on the defendant."  Koppers Co., Inc. v. Aetna Cas. & Surety Co., 98 F.3d 1440, 1448 (3d Cir. 1996).  In order to prove a failure to mitigate, a defendant must show (1) what reasonable actions the plaintiff ought to have taken, (2) that those actions would have reduced the damages, and (3) the amount by which the damages would have been reduced.  Id.  We find defendants have failed to satisfy this burden on the summary judgment record, and further observe that defendants' own expert characterized plaintiffs' efforts to restructure the loan agreements "made prudent business sense."  (Plfs' SMF ¶ 284(a).)

[18]  In their reply brief, defendants also urge the court to enter summary judgment to limit the potential measure of plaintiffs' damages.  In short, defendants insist that plaintiffs damages could never exceed the 25% guaranty

### D.      Unjust Enrichment

Finally, defendants argue that they are entitled to summary judgment on plaintiffs' claims for unjust enrichment set forth in Count V of the complaint, arguing that plaintiffs have failed to prove that they conferred any benefits upon any of the defendants, that any benefits that may have been conferred by Monahan or the partnerships were for value given, and that plaintiffs have failed to produce evidence sufficient to place a value on any abstract benefit that might have been conferred. (Doc. 148, at 89-90.)

Unjust enrichment is an equitable doctrine.  Styer v. Hugo, 619 A.2d 347 (Pa. Super. Ct. 1993).   Under Pennsylvania law, in order to prove a claim for unjust enrichment, a plaintiff must show the following: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) acceptance and retention by the defendant of the benefits, under circumstances that would make it inequitable for the defendant to retain the benefit without paying for the value of the

---

exposure to which they originally agreed, and thus the court should enter summary judgment for any claimed damages that exceed that guaranteed liability.  Whatever force this argument may have, we believe it would be unnecessary to foreclose plaintiffs even from arguing their position with respect to claimed damages at trial. In the event the district court adopts our recommendation, the parties will have an opportunity to present arguments about the scope of potential damages in this case to the jury and to the court, which may consider the issue if necessary with the benefit of a full trial record.

benefit.  Global Ground Support, LLC v. Glazer Enterprises, Inc., 581 F. Supp. 2d

669, 675 (E.D. Pa. 2008) (citing Com. ex rel. Pappert v. TAP Pharm. Prods., Inc., 885

A.2d 1127, 1137 (Pa. Commw. Ct. 2005)).  In order to sustain this burden, a plaintiff

"need not have directly dealt with each defendant in order to allege a claim of unjust

enrichment against them.  The claim of unjust enrichment simply requires that

plaintiff 'confer' benefits on a defendant; it does not require that plaintiff 'directly

confer those benefits."  Id. (quoting Baker v. Family Credit Counseling Corp., 440

F. Supp. 2d 392, 420 (E.D. Pa. 2006).  At all times, the "focus remains on the

question of whether the defendant has been unjustly enriched."  TAP Pharm. Prods,

Inc., 885 A.2d at 1137 (citing Torchia v. Torchia, 499 A.2d 581 (Pa. Super. Ct.

1985)).  Plaintiff bears the burden of "establishing either that the defendant

wrongfully secured the benefit or passively received a benefit that it would be

unconscionable to retain."  Id.

Plaintiffs argue that they have satisfied these standards and have come forward

with enough evidence to permit this claim to go forward.  In this regard, plaintiffs

assert that Hurley, Rhoads & Sinon, and the Paxton Land Company received

substantial professional fees as a result of the closing of the loan transactions in

December 2005, and that these closings took place only after plaintiffs provided the

guarantees that erroneously obligated plaintiffs to an aggregate 50% guaranty under

the loans.   Plaintiffs also argue that defendants realized these benefits, which plaintiffs conferred directly or indirectly, only by permitting the loans to close even though they never obtained the signed certifications.  Plaintiffs contend that the value of the benefit conferred can be determined based upon defendants' professional fees and loan proceeds, though plaintiffs do not point to any evidence so support this contention, or to explain how they value this claim.  (Doc. 151, at 61-62.)

Upon consideration, we find plaintiffs' claims for unjust enrichment to lack sufficient evidentiary support, and that it is too attenuated to survive summary judgment.  Plaintiffs did not pay any professional fees to defendants; these fees were paid by the partnerships, in exchange for professional services rendered, in connection with loan transactions in which Community Bank furnished the partnerships with loan proceeds for the Gateway Gettysburg development.  Even if this indirect conferral of benefits by a third party might be sufficient to support one element of an unjust enrichment claim, we simply do not find that plaintiffs have sufficiently explained or supported the remainder of their claim for unjust enrichment, where the defendants were paid fees in exchange for professional services that resulted in the release of loan proceeds that permitted the Gateway Gettysburg project to be undertaken.  Plaintiffs have not substantiated their claim that it would be "unconscionable" for these defendants to retain professional fees that they were paid

for services rendered.  Although we have found plaintiffs have raised triable claims for malpractice and breach of contract relating to these transactions, we do not find that plaintiff's equitable claim for unjust enrichment enjoys similar evidentiary or legal support, and, therefore, will recommend that defendants be granted summary judgment on this claim.

## V.    **RECOMMENDATION**

Accordingly, for the foregoing reasons, IT IS HEREBY RECOMMENDED THAT defendants' motion for summary judgment (Doc. 135.) be granted with respect to plaintiffs' claim of unjust enrichment (Count V) and denied in all other respects.

IT IS FURTHER RECOMMENDED THAT plaintiffs' motion for substitution, joinder, and ratification (Doc. 159.) be GRANTED, to permit Lefta Associates, Inc. to be substituted as the real party in interest for Lefta Associates, L.P., for the Lulu H. Auger Trust to be permitted to prosecute the claims of both the Lulu H. Auger Trust and the Ulysses G. Auger Trust, and for Dina Economides, Frank Economides, and Jeffrey Rogers to be submitted as the real parties in interest for the Lulu A. Auger Trust pursuant to Rule 17(a)(3).

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the

disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

*/s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

Dated: August 15, 2012